Heather GEE–THOMAS, Plaintiff,

v.

CINGULAR WIRELESS, Defendant.

No. 3:02–0838.

United States District Court,
M.D. Tennessee,
Nashville Division.

July 7, 2004.

Michael E. Terry, Stephanie H. Gore, Nashville, TN, for Heather Gee–Thomas.

Dianna Baker Shew, Stites & Harbison, PLLC, Nashville, TN, Myra K. Creighton, Fisher & Phillips, Tiffany Nikia Mitchell, Rebecca J. Jakubcin, Fisher & Phillips LLP, Atlanta, GA, for Cingular Wireless.

## MEMORANDUM

TRAUGER, District Judge.

Pending before the court is the Motion for Summary Judgment (Docket No. 27) of defendant Cingular Wireless ("Cingular"), to which plaintiff Heather Gee–Thomas has responded (Docket No. 35), and Cingular has replied. (Docket No. 47.) Also pending is defendant's Objection to and Motion to Strike the Affidavit of Anissa R. Pollard (Docket No. 49), to which plaintiff has responded. (Docket No. 51.) For the reasons expressed herein, defendant's Motion for Summary Judgment will be granted and its Motion to Strike will be denied as moot.

### Factual Background and Procedural History [1]

Plaintiff Heather Gee–Thomas is a 34–year old female resident of Williamson County, Tennessee. She has been married since 1993 and is the mother of two biological children and three stepchildren. Defendant Cingular is a corporation doing' business in Tennessee and a joint venture between the domestic wireless divisions of SBC Communications and BellSouth Mobility. Thomas began working for BellSouth Mobility in 1992 and has worked for either BellSouth Mobility or Cingular since then. In 1995 Thomas became a Major Account Executive ("MAE"), an outside

1. Unless otherwise noted, the factual background is drawn from Thomas's Complaint (Docket No. 1), Defendant's Answer and Affirmative Defenses to Plaintiff's Complaint (Docket No. 4), Plaintiff's Response to Statement of Undisputed Facts in Support of Defendant's Motion for Summary Judgment (Docket No. 36), and the parties' briefs relating to this motion. (Docket Nos. 28, 35, 47.)

sales position, at Cingular's Brentwood, Tennessee office. During her career at Cingular and BellSouth Mobility, the plaintiff has received many awards, garnered high marks in annual performance reviews, and exceeded her 2001 quota in every month except one.

In 2001 Cingular developed the Global Accounts Group, which was a nationwide program designed to sell cellular and wireless services to Fortune 1000 companies through sales methods geared toward those companies. The Southeast Regional Vice–President of this venture was Sally Grumbles, and Andrew Tiedt was hired as Global Accounts Group Regional Director for Tennessee, Kentucky, and the Carolinas in May 2001. Tiedt's territory included Global Accounts Director ("GAD") positions, Senior Business Sales Manager ("BSM") positions, Global Account Manager ("GAM") positions, and Business Sales Specialist ("BSS") positions. The GAD and BSM positions were middle management positions reporting to the Regional Director, while the GAM position, an outside sales position, and the BSS position, a sales support position, both reported to the BSM position.

On December 4, 2001 Cingular posted the BSM position for Tennessee and Kentucky. Tiedt was in charge of interviewing and making the hiring decision for the position. Six candidates applied for the position, including Thomas, and interviews were conducted with Michael Birchler, Eydie Walters, and Arthur Scott. Tiedt contacted Thomas by phone after her application to tell her that he was not planning to interview her for the position. On December 18, 2001, Tiedt hired Birchler for the Nashville BSM position. At the time of his hire, Birchler was married with children. (Docket No. 41, Deposition of Michael T. Birchler at 152.)

Thomas was not interviewed for the BSM position. Defendant contends that Thomas was not interviewed because she, like the other applicants not interviewed, lacked the desired sales management experience. Plaintiff disputes this reasoning, stating that Tiedt never considered any relevant skill sets possessed by Thomas just as he never considered her for the job. In addition, it is undisputed that Birchler was an external candidate at the time he was hired and had never been a Cingular employee. It is also undisputed that Cingular's "General Staffing Process" stipulates that internal candidates are to be considered before external candidates' resumes are reviewed and that Cingular preferred qualified internal employees to external employees. (Docket No. 37, Ex. 1, General Staffing Process; Docket No. 37, Ex. 2, Cingular Career Opportunities at 12; Docket No. 42, Deposition of Emily Huggins Leonard at 46.) Plaintiff characterizes this preference as a "policy," while defendant characterizes it as a "guideline." (Docket No. 36 ¶ 25; Docket No. 42, Leonard Dep. at 46, 76.)

Also on December 4, 2001, Cingular posted the Nashville GAM position, for which Thomas also applied. Thomas arranged a meeting with Tiedt after his phone call to tell her she would not be interviewed for the BSM position, while the GAM position was still open. In the meeting, which occurred in the first part of January 2002 after Birchler had begun work, Thomas asked Tiedt what he was looking for in the GAM position, and he replied that he needed someone aggressive who could "turn on some numbers really quickly" (which the court understands to mean selling or activating new phone numbers). (Docket No. 38, Attachment, Deposition of Heather Gee–Thomas at 70, 73–74, Additions and Changes to Deposition at 2.) According to the plaintiff, Tiedt then said, "You don't want to travel, do you?" *Id.* at 70. Thomas understood this comment to refer to the fact that she was a

mother because, in her opinion, it was the only difference between her and the applicant later chosen for the position. *Id.* at 71–73.

Of the eight applicants for the GAM position, Birchler interviewed five people in January 2002: Heather Gee–Thomas, Diane McDaniel, Cyndi Betz, Greg Saino, and Leigh Walker. (Docket No. 37, Ex. 5, Chart of "Amended Strategic Accounts Group Positions.") Leigh Walker, a single female and Cingular MAE, was ultimately selected for the position. Thomas was not selected. On March 15, 2002, Thomas met with Sally Grumbles, the Southeast Regional Vice–President, after filing a complaint with Cingular's Human Resources Department. The meeting was largely regarding Thomas's non-selection for the GAM position, but it also concerned "the whole Global Group." (Docket No. 37, Attach., Thomas Dep. at 85, 150.) In that discussion, Grumbles commented that she and Thomas had chosen to work in a "man's world" (which she defined as a "world of business").[2] *Id.* at 154. Plaintiff admits that Grumbles was not the decisionmaker for the GAM position, nor did she communicate with Birchler or Tiedt about the position. (Docket No. 36 ¶¶ 34, 35.)

Plaintiff filed a written charge with the Equal Employment Opportunity Commission within 180 days of the alleged discriminatory acts. A Notice of Right to Sue was issued in July 2002. Subsequently, on August 28, 2002, Thomas filed a complaint in this court alleging violations of 42 U.S.C.2000e *et seq.*, Title VII of the Civil Rights Act of 1964; 42 U.S.C.1981(a);[3] and Tenn.Code. Ann. § 4–21–101 *et seq.*, the Tennessee Human Rights Act ("THRA").

### Discussion

I. *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). To prevail, the moving

---

2. Thomas testifies:

> Q. What exactly did Ms. Grumbles say to you?
> A. She said that she hasn't always thought hiring decisions were fair but from time to time she had to sit back and say to herself, "Sally, I did choose to work in a man's world." And I asked her what she meant by that and she said, "I chose to work in a world of business." And I said, "Excuse me? How is that a man's world?" And I didn't choose to work in a man's world. I chose to have a career.
> Q. She was talking about herself, correct?
> A. Yes. But she was implying the same thing to me. She encouraged me to do the same thing.
> Q. What was—what "same thing" was she encouraging you to do?
> A. She said, "I had said to myself, 'Sally, you know, I chose to work in a man's world and so I have to deal with the consequences of it,' and I encourage you to do the same thing."

(Docket No. 37, Attach., Thomas Dep. at 154–55.)

3. Although the plaintiff alleges a violation of 42 U.S.C. § 1981(a), the Civil Rights Act of 1991, in her complaint, (Docket No. 1, Complaint ¶¶ 3), she does not repeat this claim in her brief in opposition to defendant's Motion for Summary Judgment. Moreover, claims of discrimination based on gender are not cognizable under § 1981, which applies only to race or ethnicity-based claims. *See Wesley v. Howard Univ.*, 3 F.Supp.2d 1, 3 (D.D.C.1998); *see also St. Francis College v. Al–Khazraji*, 481 U.S. 604, 613, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987). Because Thomas does not contend that the defendant discriminated against her due to her race or ethnic characteristics, her § 1981 claim will be dismissed.

party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1477 (6th Cir. 1989). In determining whether the moving party has met its burden, the court must view the factual evidence and draw reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *McLean v. Ontario, Ltd.,* 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC,* 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). If the nonmoving party, however, fails to make a sufficient showing on an essential element of the case with respect to which the nonmoving party has the burden, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.,* 187 F.3d 533, 537–38 (6th Cir.1999).

■ To preclude summary judgment, the nonmoving party "is required to present some significant probative evidence that makes it necessary to resolve the parties' differing versions of the dispute at trial." *Gaines v. Runyon,* 107 F.3d 1171, 1174–75 (6th Cir.1997). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Shah v. Racetrac Petroleum Co.,* 338 F.3d 557, 566 (6th Cir.2003) (quoting *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. To determine whether the nonmoving party has raised a genuine issue of material fact, the evidence of the nonmoving party is to be believed and all justifiable inferences drawn in his favor. *Id.* at 255, 106 S.Ct. 2505.

■ The court should also consider whether the evidence presents "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.,* 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson,* 477 U.S. at 251– 52, 106 S.Ct. 2505). "There is no genuine issue for trial unless the nonmoving party has produced enough evidence for a jury to be able to return a verdict for that party." *Tinsley v. General Motors Corp.,* 227 F.3d 700, 703 (6th Cir.2000). If the evidence offered by the nonmoving party is "merely colorable," or "is not significantly probative," or enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson,* 477 U.S. at 249–52, 106 S.Ct. 2505. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White,* 190 F.3d 427, 430 (6th Cir.1999) (citations omitted).

II. *Analysis*

■ Plaintiff Thomas presents two claims, both concerning her non-selection for the Nashville position of Senior Business Sales Manager ("BSM").[4] In the first

---

4. In response to arguments made by the defendant in its memorandum in support of its Motion for Summary Judgment, Thomas states in her brief that, although evidence regarding Cingular's hiring and promotion

claim, Thomas asserts that she was denied the BSM position because of her gender, and the position was filled by an obviously less-qualified male. (Docket No. 35 at 2.) In the second claim, Thomas asserts that she was denied the BSM position because male decisionmakers considered non-job-related criteria for women applicants that they did not consider for male applicants, including family and marital status. *Id.* These claims are asserted under both Title VII and the THRA. Because "the stated purpose and intent of the [THRA] is to provide for execution within Tennessee of the policies embodied in the federal civil rights laws," *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 31 (Tenn.1996) (citing Tenn.Code Ann. § 4-21-101(a)(1)), the analysis of claims under the THRA is the same as under Title VII.[5] *Id. See also Wade v. Knoxville Utilities Bd.*, 259 F.3d 452, 464 (6th Cir.2001). Accordingly, the analysis of plaintiff's Title VII claims applies to her THRA claims as well.

■ Title VII of the Civil Rights Act of 1964 prohibits discrimination by an employer against any person on the basis of race, color, religion, sex, or national origin, including an employer's failure or refusal to hire a person on such basis. 42 U.S.C. § 2000e-2(a)(1) (2004). Title VII also prohibits so-called "gender plus" or "sex plus" discrimination, by which an employer discriminates, not against the class of men or women as a whole, but against a subclass of men or women so designated by their sex plus another characteristic. *Back v.*

Hastings on Hudson Union Free School District, 365 F.3d 107, 118 n. 7 (2d Cir. 2004) (quoting 1 Barbara Lindemann & Paul Grossman, *Employment Discrimination Law* 456 (3d ed.1996)). The Supreme Court first observed sex plus discrimination in *Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 544, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971), when it found that Title VII does not permit one hiring policy for women with pre-school-age children and another hiring policy for men with pre-school-age children. The courts of appeals have followed suit. See *Coleman v. B-G Maintenance Management of Colorado, Inc.*, 108 F.3d 1199, 1203-05 (10th Cir.1997) (recognizing sex plus discrimination but finding reversible error in jury instructions and insufficient evidence on which to return a verdict in plaintiff's favor); *Fisher v. Vassar College*, 70 F.3d 1420, 1433-34, 1448 (2d Cir.1995) (recognizing a sex plus claim of sex plus marital status but finding insufficient evidence to sustain the district court's finding of liability), *aff'd en banc*, 114 F.3d 1332 (1997), *cert. denied*, 522 U.S. 1075, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998); *Bryant v. Int'l Schools Servs., Inc.*, 675 F.2d 562, 573 n. 18 (3d Cir.1982) (recognizing a claim of sex discrimination premised on marital status but observing that such a claim was not at issue in the case); see also *Fuller v. GTE Corp./Contel Cellular, Inc.*, 926 F.Supp. 653, 658 (M.D.Tenn.1996) (finding that plaintiff had failed to establish a prima facie case of disparate treatment either due to gender

decisions with respect to the Nashville Global Accounts Director position, the Area Retail Manager position, and the Global Accounts Manager position may be relevant at trial to prove discrimination, her claims in this lawsuit involve only the Nashville BSM position. (Docket No. 35 at 8-9.) The defendant argues that Thomas has therefore abandoned any claims concerning these three positions and any claims involving pattern and practice allegations in her complaint. (Docket No. 47

at 1.) The court agrees that summary judgment should be granted as to all claims unrelated to the Nashville BSM position, and all such claims will be dismissed.

5. Similarly, although this court has not found any decision concerning a sex plus claim under the THRA, because the statute is intended to implement the policies of the federal civil rights laws, it would follow that a sex plus claim could be maintained under the THRA.

or plaintiff's status as a mother of young children).

Courts have agreed that sex plus discrimination is ultimately premised on sex:

> [W]hen one proceeds to cancel out the common characteristics of the two classes being compared ([e.g.] married men and married women), as one would do in solving an algebraic equation, the cancelled-out element proves to be that of married status, and sex remains the only operative factor in the equation.

*Coleman*, 108 F.3d at 1203 (quoting Lex K. Larson, *Employment Discrimination* § 40.04, at 40–12 (2d ed.1996)) (alteration in original); *see also Back*, 365 F.3d at 118 (characterizing "sex plus" as a heuristic employed for judicial convenience to isolate when plaintiffs can survive summary judgment even if not all members of a disfavored class are discriminated against, and charging that the relevant issue in such an inquiry is "whether the plaintiff provides evidence of purposefully sex-discriminatory acts"). The court also takes notice of the observation of the *Fisher* court regarding the propriety of undertaking two separate analyses for claims of sex discrimination and sex plus discrimination. In a footnote, the *Fisher* court observed:

> In its amicus brief, the Equal Employment Opportunity Commission argues that the district court erred when it separated its analysis of sex discrimination from sex plus marriage discrimination. This is a valid criticism. Sex plus marriage discrimination is simply a subcategory of sex discrimination. To discriminate on the basis of sex plus marriage is to discriminate on the basis of sex.

*Fisher*, 70 F.3d at 1449 n. 14. Accordingly, the court will analyze the plaintiff's two Title VII claims together.

 Whether the discrimination is premised on sex or sex plus another characteristic, Title VII prohibits both discrim-inatory treatment of protected persons and the use of facially neutral policies that have a disparate impact on protected persons. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252, 253 n. 5, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). To make out a claim of discriminatory treatment, such as the claim at issue in the present case, a plaintiff may either present direct evidence of discrimination or adduce circumstantial evidence to create an inference of discrimination under the *McDonnell Douglas Corp. v. Green* burden-shifting approach. *See DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir.2004); *see also Burdine*, 450 U.S. at 252–55, 101 S.Ct. 1089; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Seay v. Tenn. Valley Authority*, 339 F.3d 454, 463 (6th Cir.2003). Both parties agree that the *McDonnell Douglas* analysis is proper in this case. (Docket No. 28 at 11; Docket No. 35 at 9.)

 Under the *McDonnell Douglas* approach, the plaintiff must first make out a *prima facie* case of discriminatory treatment by showing, in the case of a person's non-selection for a job: (1) that she is a member of a protected class; (2) that she applied for and did not receive a job; (3) that she was qualified for the job; and (4) that a similarly-situated person who was not in the plaintiff's protected class received the job. *Seay*, 339 F.3d at 463. The burden of making out a *prima facie* case of disparate treatment is "not onerous" and, when established, creates "a presumption that the employer unlawfully discriminated against the employee." *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089. Once the plaintiff has established her *prima facie* case, the burden shifts to the defendant to "rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondis-

criminatory reason." *Id. See also Seay,* 339 F.3d at 463. "[S]hould the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089. "A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Seay,* 339 F.3d at 463 (quoting *Hopson v. DaimlerChrysler Corp.,* 306 F.3d 427, 434 (6th Cir.2002)).

### A. *Plaintiff's Prima Facie Case*

█ There seems to be no genuine dispute that the plaintiff is able to fulfill the requirements of the first three components of her *prima facie* case. First, it is undisputed that plaintiff is a woman, and the defendant does not contest that Thomas was married with children at the time of the events relevant to this case. (Docket No. 36, Plaintiff's Response to Statement of Undisputed Facts in Support of Defendant's Motion for Summary Judgment ¶ 1; Docket No. 4, Defendant's Answer and Affirmative Defenses to Plaintiff's Complaint ¶ 7.) Second, it is undisputed that Thomas applied for the BSM position and that she did not receive the position. (Docket No. 4 ¶¶ 14, 16; Docket No. 36 ¶ 23.) Third, as the plaintiff observes in her brief, Cingular never argues that Thomas was unqualified for the BSM position; it merely argues that Birchler was more qualified. (Docket No. 35 at 11.) The defendant does not refute this claim. Therefore, there is no genuine dispute that Thomas was qualified for the job.

With regard to the fourth component of plaintiff's *prima facie* case, the defendant asserts that Thomas is unable to show that Cingular treated a similarly-situated male more favorably than it treated her. (Docket No. 47 at 5.) Cingular characterizes plaintiff's sex plus claim as involving six plus factors—marital status, family status, age, attractiveness/special physical appearance requirements, flirtatiousness, and favoritism—and observes that Title VII does not recognize many of these factors. *Id.* at 4–5. The defendant argues that, even if the court accepts this six plus factor category, the plaintiff is unable to show that Birchler also meets these factors. *Id.* at 5.

The court does not read Thomas's complaint or her brief as asserting a sex plus claim with six plus factors; rather, the court interprets plaintiff's claim as a claim of discriminatory treatment on the basis of sex plus marital and family status. In framing her sex plus claim, the plaintiff contends that she was denied the BSM position because decisionmakers considered non-job-related criteria for female applicants, "including family and marital status, a condition not imposed on male applicants." (Docket No. 35 at 2, 9.) She asserts that the "evidence with regard to Cingular's disparate treatment of females who are married and/or with children and with similarly situated males is abundant." *Id.* at 14. While plaintiff's complaint does contain allegations that Cingular has generally engaged in a pattern and practice of imposing age and special physical appearance requirements on women and not men (Docket No. 1 ¶ 18), the specific allegations relevant to the plaintiff's non-selection for the BSM position rely on defendant's treatment of her with regard to her family and marital status. *Id.* ¶ 16, 22, 24. With regard to plaintiff's non-selection for the BSM position, the only matter still at issue, Thomas has not substantially argued that the defendant engaged in discriminatory treatment against her on the basis of age or special appearance requirements (much less favoritism or flirtatiousness), although her deposition testimony

does discuss such matters. (Docket No. 38, Attach., Thomas Dep. at 124–25, 141, 142, 145–46, 148, 180–81) Therefore, the court considers her claim to be one of discriminatory treatment on the basis of sex plus marital and family status. As such, plaintiff is able to satisfy the fourth component of the *prima facie* case, because it is undisputed that Birchler, who was selected for the BSM position, was married with children at the time of his selection.[6] (Docket No. 4 ¶ 16; Docket No. 36 ¶ 23; Docket No. 41, Birchler Dep. at 152.) Therefore, plaintiff is able to show that a similarly-situated person (i.e., a married person with children) outside of the protected class (i.e., male instead of female) received the job and she did not. Plaintiff has established her *prima facie* case.

### B. Legitimate Nondiscriminatory Reason

■ The defendant asserts that its legitimate, nondiscriminatory reason for hiring Birchler and rejecting Thomas for the BSM position was that Birchler was the most qualified candidate. (Docket No. 28 at 18; Docket No. 47 at 5.) Cingular asserts that Birchler was the most qualified as measured by qualifications developed by Sally Grumbles and relied on by Andrew Tiedt, who interviewed candidates for the

BSM position and made the decision to hire Birchler for the job. (Docket No. 47 at 12, 13; Docket No. 28 at 18; Docket No. 36 ¶ 23.) Cingular presents testimony and affidavit evidence by Tiedt to this effect. (Docket No. 36 ¶¶ 23, 24.) According to the defendant, Birchler had managerial experience, relationship-based sales experience, and experience with land lines (valuable to companies seeking to integrate land lines with wireless). (Docket No. 47 at 13; Docket No. 28 at 18.) Cingular also asserts that Birchler's expertise with a "structure around a national account organization" (which the court understands to mean focusing on a client's nationwide service needs) and prior experience at BellSouth with many of the clients and companies who would be part of the Global Accounts group made him an attractive candidate, as distinguished from Thomas, who did not have these qualifications. (Docket No. 44, Tiedt Dep. at 64, 65; Docket No. 47 at 13.)

■ To carry its burden of production at this stage of the inquiry, the defendant "need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089. Rather, the defendant's burden is to present admissible evidence, not mere ar-

---

**6.** There is some disagreement among courts as to whether or not a plaintiff claiming sex plus discrimination must compare herself to a similarly-situated person of the opposite gender in order to prevail on her claim and, if so, whether she must make that comparison as part of her *prima facie* case or as part of her pretext argument under the *McDonnell Douglas* burden-shifting approach. *See Coleman*, 108 F.3d at 1203 (finding that plaintiff, a married woman, was required to prove she was unfavorably treated as compared to a corresponding subclass of married men); *Fuller*, 926 F.Supp. at 658 (finding that plaintiff, a mother of young children, was required to show evidence that she was treated differently than similarly-situated fathers of young children as part of her prima facie case);

*Trezza v. The Hartford, Inc.*, No. 98 CIV. 2205(MBM), 1998 WL 912101, at *6 (S.D.N.Y. Dec.30, 1998) (finding that plaintiff was only required to compare herself to similarly-situated men but only at the pretext stage). *But see Back*, 365 F.3d at 121 (observing that defendants were wrong to say that plaintiff could not make out a claim that survived summary judgment unless she was treated differently than similarly-situated men when the evidence adduced concerned stereotypical remarks about gender and motherhood). This disagreement is not implicated in this case because plaintiff is able to show as part of her *prima facie* case that she was treated differently than a similarly-situated male, i.e., Birchler, who was hired for the BSM position when she was not.

gument of counsel or allegations in its answer, that establishes a genuine issue of fact as to whether it discriminated against the plaintiff. *Id.* at 254–55 n. 9, 101 S.Ct. 1089. With the evidence in Tiedt's deposition testimony and affidavit, defendant has met its burden of production. Thus, the only remaining question is whether the plaintiff is able to raise a genuine issue of material fact that defendant's legitimate, nondiscriminatory reason was pretextual.

### C. Pretext

■ "A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Seay,* 339 F.3d at 463 (quoting *Hopson,* 306 F.3d at 434).

■ In attempting to establish pretext, the plaintiff first attacks the sufficiency of the defendant's evidence. Thomas's brief describes Tiedt's 2004 affidavit, which was filed months after his deposition testimony, as "a self-serving, last minute attempt to offer a legitimate non-discriminatory reason for the selection of Birchler" that provides "specifics which Tiedt could not provide at his deposition" and "seems to contradict his November 2003 deposition." (Docket No. 35 at 15.) The only aspect of Tiedt's deposition testimony that plaintiff cites as contradicted by his later affidavit is Tiedt's failure to recollect Thomas's application for the BSM position during his testimony. *Id.* This discrepancy does not render Tiedt's later affidavit false or undercut its value as evidence. Nor does this discrepancy establish that Tiedt's legitimate, nondiscriminatory reason for hiring Birchler was pretextual, baseless, or motivated by discriminatory intent.

The plaintiff next argues that Tiedt's true motivation in his hiring scheme was to "handpick" employees such as Birchler to "fit the mold" of people he was looking for

to staff the Global Accounts Group. *Id.* She supports this contention by citing Tiedt's own deposition testimony, his comments a year later to another employee, and his "bias" in favor of men at the management level as witnessed by his July 2001 selection of three men for the Global Accounts Director positions from among a list that included twelve female applicants. *Id.*

■ At his deposition, Tiedt testified, in response to a question concerning what criteria he used to decide who would interview for the *Global Accounts Director* positions, that he looked at:

> what their past experiences were, how they would fit the mold of the people we were looking for, what their roles and [sic] their perspective states were. How they could help me put this organization together is some of the stuff I remember.

(Docket No. 44, Deposition of Andrew Thomas Tiedt at 40.) Tiedt's use of the phrase "fit the mold" related to his selection of candidates for a different position within the Global Accounts Group than the BSM position—a position for which Thomas was not a candidate—and was not used to refer to Thomas herself. In addition, Tiedt used the phrase in deposition testimony, not at the time the decision was made. Most importantly, the phrase "fit the mold" is ambiguous and open to a variety of meanings. Ambiguous remarks in isolation are not sufficient to support an inference of discriminatory intent. *See Betkerur v. Aultman Hosp. Ass'n,* 78 F.3d 1079, 1096 (6th Cir.1996) (finding that a hospital president's remark that plaintiff was "not a selling person" was too ambiguous and remote in time to stand as sufficient evidence that the hospital decisionmakers relied on impermissible motives in failing to select her for a position); *Phelps v. Yale Security, Inc.,* 986 F.2d 1020, 1025–

26 (6th Cir.1993) (finding that a comment that plaintiff's approaching fifty-fifth birthday was a "cause for concern" was too ambiguous to establish an inference of age discrimination), *cert. denied*, 510 U.S. 861, 114 S.Ct. 175, 126 L.Ed.2d 135 (1993).

Plaintiff has presented no evidence that "fit the mold" has any connection to a sex-based or marital and family status motivation. The possibility that the phrase is meant to suggest a search for a candidate who possessed the desired experiential qualifications is just as likely as the possibility that it reflects an improper motive on Tiedt's part. Additionally, although the three candidates selected to be Global Accounts Directors were all men from among a field that included twelve female applicants, one female applicant, Connie Lynch, did interview with Tiedt for the job. (Docket No. 37, Ex. 5, Chart of "Amended Strategic Accounts Group Positions"; Docket No. 44, Tiedt Dep. at 38, 40, 41.) The fact that Lynch interviewed for the position, and therefore presumably "fit the mold of the people we were looking for" so as to gain an interview, further erodes plaintiff's argument that fitting the mold referred to a candidate's gender, familial, or marital status.

Similarly, plaintiff relies on the affidavit of Anissa Pollard, a woman who became a Business Sales Specialist in the Global Accounts Group on February 1, 2002, who states that Tiedt told her that "the persons chosen to be in Global had been hand-picked by him." (Docket No. 37, Ex. 10, Affidavit of Anissa R. Pollard ¶ 4.) The use of the term "handpicked" in reference to the selection of all of the Global Accounts Group staff cannot be deemed indicative of any kind of illegal discrimination, and the plaintiff presents no additional evidence that would make it so. "Handpicking" connotes careful selection but in no way attributes to Tiedt discriminatory motivations for the selections based upon gender, familial, or marital status. This remark is not sufficient to create a genuine issue of material fact as to pretext.

Finally, the plaintiff attempts to create a genuine issue of material fact with respect to pretext by challenging the truth of Cingular's legitimate, nondiscriminatory reason for hiring Birchler—that he was the most qualified—and seeking to establish that it had no basis in fact. The plaintiff compares her own qualifications to Birchler's qualifications to suggest that it "is simply not true that Michael Birchler was more qualified for the BSM Nashville position than Heather Thomas." *Id.* at 16.

■ Case law provides that, unless a plaintiff's qualifications are obviously superior to those of the candidate who was hired, the court will not find evidence of pretext in an organization's failure to hire an equally qualified candidate. In *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1180 (7th Cir.2002), the Seventh Circuit adopted an approach to this matter first established by the Fifth Circuit in *Deines v. Tex. Dep't of Protective and Regulatory Servs.*, 164 F.3d 277, 280–81 (5th Cir.1999) and adopted by the Second, Tenth, Eleventh, and D.C. Circuits at the time of that decision, *see Millbrook*, 280 F.3d at 1180, (and by the First Circuit since then). *See Rathbun v. Autozone, Inc.*, 361 F.3d 62, 74 (1st Cir.2004). The *Millbrook* court stated that:

> where an employer's proffered non-discriminatory reason for its employment decision is that it selected the most qualified candidate, evidence of the applicants' competing qualifications does not constitute evidence of pretext "unless those differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue."

*Millbrook,* 280 F.3d at 1180 (quoting *Deines,* 164 F.3d at 279). In adopting this rule, the *Millbrook* court emphasized that the jury's sole task is to determine whether an employer's selection of an applicant was motivated by discrimination, not to "scrutinize the employer's judgment as to who is best qualified to fill the position" or to "weigh the respective qualifications of the applicants." *Millbrook,* 280 F.3d at 1179–80 (quoting *Deines,* 164 F.3d at 279).

The Sixth Circuit has also observed that it is not the court's place to question a business's choice from among qualified candidates, as long as its motivation was not discriminatory:

> It may be worthwhile to note here that Title VII does not diminish lawful traditional management prerogatives in choosing among qualified candidates. So long as its reasons are not discriminatory, an employer is free to choose among qualified candidates. An employer has even greater flexibility in choosing a management-level employee ... because of the nature of such a position.

*Wrenn v. Gould,* 808 F.2d 493, 502 (6th Cir.1987) (upholding district court's finding that plaintiff had failed to demonstrate that an organization's reasons for hiring another candidate, whose credentials later proved to have been falsified, were pretextual when both candidates appeared qualified) (internal citations omitted). The *Millbrook* court tied its refusal to inquire into all but the most obviously flawed choices from among candidates of competing qualifications to its recognition that an employee's belief in his own superior quali-

fications cannot create an issue of material fact because "[a]n employee's perception of his own performance ... cannot tell a reasonable factfinder something about what the employer believed about the employee's abilities." *Millbrook,* 280 F.3d at 1181 (quoting *Olsen v. Marshall & Ilsley Corp.,* 267 F.3d 597, 602 (7th Cir.2001)) (alteration in original). The Sixth Circuit has echoed this sentiment: "[plaintiff's] perception of his competence, and the incompetence of those competing against him, is irrelevant; the search committee's perceptions and motivations are key." *Wrenn,* 808 F.2d at 502.

In this case, as the defendant points out, the plaintiff's brief never states that Thomas was "more qualified" than Birchler for the BSM job.[7] (Docket No. 47 at 11.) Rather, the plaintiff attempts to demonstrate that "it is simply not true that Michael Birchler was more qualified for the BSM Nashville position" by highlighting several factors. She cites her demonstrated success at Cingular—the fact that she had been an internal employee at Bell-South/Cingular since 1992, and that she had received superior evaluations, high recommendations, and multiple awards for service. (Docket No. 35 at 17). She contrasts these qualifications with the fact that Birchler was not a Cingular employee. *Id.* She cites her managerial experience— three and one-half years' managerial experience in wireless as Cingular's MAE team leader—and contrasts this with Birchler's less than two years of managerial experience as a PBX Sales Manager for Bell-South and eventual layoff from that posi-

---

**7.** In a complicated piece of logical reasoning, Thomas contends that Birchler admitted to her that she was the most qualified candidate for either the GAD, GAM, or BSM positions. Thomas asserts that Birchler told her that she was overqualified for the GAM position and that she should have been a GAD. (Docket No. 36 ¶ 26.) Because the GAD position is senior to the BSM position, Thomas views this statement as an admission that she was the most qualified candidate for any of the three positions. *Id.* Aside from this inventive view of the evidence, Thomas makes no argument that she was objectively more qualified than Birchler.

tion. *Id.* at 16, 17. She cites what she characterizes as her "strategic sales experience" in the position of MAE, which was one qualification Tiedt sought in the BSM candidate, and contrasts this experience with Birchler's strategic sales experience in his two-year position at BellSouth. *Id.* at 16. She cites her experience as a strategic sales executive since 1995 handling the matters of the specific customers who were transferred to the Global Accounts Group, and her nine years' experience working in wireless, and contrasts this with Birchler's lack of wireless experience. *Id.* at 16, 17.

The defendant asserts that plaintiff has mischaracterized her qualifications, specifically by distorting her "management experience," and has characterized her qualifications according to criteria that she viewed as important for the job of BSM, rather than those that Cingular valued. (Docket No. 47 at 12, 13–14.) Specifically, Cingular states that it sought a candidate with experience managing a team of sales representatives like MAE, and that, although Thomas did manage clients' accounts, she did not have experience managing a team of account managers.[8] *Id.* at 12. Cingular states that it sought a candidate with relationship-based selling experience, such as Birchler had, and that, although Thomas attempts to characterize her experience as involving "strategic sales," she did not have this relationship-based selling experience. *Id.* at 13.

Plaintiff is unable to pass the high bar necessary to establish that her competing qualifications may create a triable issue of pretext, because the differences between these candidates are not so favorable to the plaintiff as to forestall dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position. Even viewing all of the facts in the light most favorable to the plaintiff, the evidence could only establish that Thomas was as qualified as Birchler for the position. While the court recognizes that legal argument is not evidence, Thomas does not even argue that she was more qualified than Birchler. Without presenting evidence of obviously superior qualifications, plaintiff has not succeeded in raising a genuine issue of material fact that defendant's reason for choosing Birchler was pretextual. Nor does the other evidence adduced by the plaintiff and discussed above, when considered in connection with this argument, establish a triable question of fact as to pretext. Without such evidence, the plaintiff has failed to raise a genuine issue of material fact for trial; thus, her claims will be dismissed.

### III. *Motion to Strike Affidavit of Anissa R. Pollard*

Cingular seeks to strike portions of Anissa R. Pollard's affidavit because it contends that Pollard's affidavit contains inadmissible opinion testimony, inadmissible hearsay, and statements made without personal knowledge of the circumstances, in addition to failing to attach certain documents referred to in the affidavit. (Docket No. 49.) Plaintiff asserts that Pollard's affidavit satisfies the requirements of Federal Rule of Civil Procedure 56(e), (Docket No. 51 at 4), which requires that affidavits submitted in support of a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall

---

8. In response to the defendant's statement of undisputed material fact that Thomas had "never managed a sales team, her only 'managerial' experience was 'supervising' the Business Sales Specialists who supported her and other Major Account Executives," Thomas sidesteps the issue by merely "[a]dmit[ting] that Thomas had supervised employees in the wireless sales business for Cingular since 1996" and failing to address the contention that she had never managed a sales team. (Docket No. 36 ¶ 27.)

show affirmatively that the affiant is competent to testify to the matters stated in the affidavit." Fed.R.Civ.P. 56(e). Because the court did not consider the portions of Pollard's affidavit challenged by the defendant, defendant's motion to strike will be denied as moot.

### Conclusion

For the reasons expressed herein, the defendant's Motion for Summary Judgment (Docket No. 27) will be granted and her claims dismissed. Defendant's Objection to and Motion to Strike the Affidavit of Anissa R. Pollard will be denied as moot.

An appropriate order will enter.

### ORDER

For the reasons expressed in the accompanying memorandum, the Motion for Summary Judgment (Docket No. 27) filed by defendant Cingular Wireless is **GRANTED** and the claims of plaintiff Heather Gee–Thomas are **DISMISSED**. Defendant's Objection to and Motion to Strike the Affidavit of Anissa R. Pollard (Docket No. 49) is **DENIED** as moot.

It is so ordered.