NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0354n.06

Case No. 14-5890

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
May 11, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| YOLANDA DIONNE WADE, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| AUTOMATION PERSONNEL SERVICES, | ) | DISTRICT OF TENNESSEE |
| INC. and TAMMY GROSS, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

O P I N I O N

BEFORE: BOGGS and McKEAGUE, Circuit Judges; PEARSON, District Judge.[*]

McKEAGUE, Circuit Judge. Yolanda Wade worked as one of three employees in the

Chattanooga office of Automation Personnel Services, an all-female office. After months of

allegedly inappropriate behavior by her supervisor, Tammy Gross, Wade brought various Title

VII and Tennessee Human Rights Act claims against Gross and Automation, alleging a hostile

work environment caused by sexual, racial, and religious harassment. She also brought state-law

claims for retaliatory discharge and intentional infliction of emotional distress. The district court

granted summary judgment for Automation and Gross. Because we agree that Wade has not

---

[*]The Honorable Benita Y. Pearson, United States District Judge for the Northern District of
Ohio, sitting by designation.

presented sufficient evidence to demonstrate a genuine issue of material fact as to any of her claims, we affirm.

## I.

Automation Personnel Services, Inc. is a temporary staffing agency with offices around the country. Automation originally hired Yolanda Wade for a temporary position in February 2011, in the Chattanooga, Tennessee office. A few months later, she was hired full-time, and she worked there until she resigned in November of 2011. Throughout Wade's tenure at Automation, there were just three employees in the branch: Tammy Gross, Natalie Akins, and Wade. Gross, the Branch Manager, was Wade's supervisor.

On November 15, 2012, Wade filed a complaint against Automation and Gross, alleging a hostile work environment created by sexual, racial, and religious harassment as well as retaliation under Title VII of the Civil Rights Act, 42 U.S.C. § 2000(e), and the Tennessee Human Rights Act (THRA), Tenn. Code Ann. § 4-21-401. She also alleged retaliatory discharge under Title VII and the THRA, and intentional infliction of emotional distress under Tennessee common law. The district court granted Automation and Gross's motion for summary judgment on July 7, 2014, holding that Wade had not presented sufficient evidence to sustain any of her alleged causes of action. Wade appeals, relying on the following facts that were presented to the district court.

*Sexual Harassment.* Wade alleges a handful of incidents that she claims amount to same-sex sexual harassment. First, at some point during Wade's employment, she was feeling physical pain caused by her bra. She left her desk to remove it and returned to inform Akins that she had removed her bra due to the pain. Akins suggested a more comfortable brand of bra. Gross then approached the two, informed them that she did not wear bras or underwear, and

proceeded to lift her shirt and expose her breasts. Wade states that she immediately told Gross that she was "out of order" and then left the building. R. 35-6 at Page ID # 845–47. After this incident, Gross repeatedly suggested that Wade not wear undergarments, and she would often ask whether Wade was wearing any. On another occasion, on a hot day, Gross came into the office, stated that she was soaking wet and that she could "wring water out of [her] bra." R. 28-8 at Page ID # 597.

On yet another day in the office, Wade alleges that Gross gestured towards Wade's breasts with her hands while the two were walking down a narrow hallway, and called them "big hoobie boobies." R. 35-6 at Page ID # 852. Wade told her the comments were inappropriate, but Gross responded, "Honey, that's just how I am." *Id.*

Wade alleges one more relevant incident. During a discussion at work about whether gay couples should adopt children, Gross told Wade and Akins that if Gross were a lesbian, she would date her lesbian friend. Gross had been married for twenty years and shared two children with her ex-husband.

*Racial Harassment.* Wade alleges behavior by Gross that Wade claims amounts to racial harassment. Wade and Akins are both African-American. Gross, who is Caucasian, gave Wade and Akins nicknames referring to African-American characters in the popular fiction book and movie, *The Help*. Wade and Akins overheard Gross telling Renee Clark, Automation's Regional Manager, about the names and Clark allegedly laughed in response.

Wade alleges that on another occasion Gross stated she thought Mexicans were lazy and had no right to be in the United States. According to Wade, Gross's racism infiltrated her work. Gross allegedly screened temporary staffer applicants for race by pulling applicants' corresponding I-9 forms and photographs before placing assignments. On another day, Gross,

who had a permit to carry a gun, brought a gun to work and announced that she was the "bitch in charge." R. 35-6 at Page ID # 871–72. Wade admitted that Gross did not threaten her or Akins with this gun or remove it from the holster. But she alleges that this action has sexual and racial undertones.

In addition to Gross's conduct, Wade described broader racial issues at Automation. Specifically, one of Automation's clients, MPW, had an employee with a history of making racist remarks towards Automation's temporary staffers. At one point, this employee told Akins, "Shut up you incompetent little black girl." R. 35-7 at Page ID # 891, 903. Although Wade and Akins frequently complained about the customer, they were instructed to disregard these concerns because MPW was an important client.

*The Aftermath.* Wade eventually spoke to Clark about Gross's behavior. Clark said she would talk to Gross about it. The following day, Clark followed up with Wade and informed her that her allegations did not constitute sexual harassment and that she was just having personality and cultural difficulties with Gross. Wade was frustrated because she had told Clark that she had already confronted Gross several times. Clark did, however, admonish Gross for using I-9s to screen temporary staffer placements. Clark also claims to have told Gross that the nicknames based on *The Help* and the underwear discussions were inappropriate. Wade acknowledged that after her conversation with Clark, Gross no longer acted inappropriately in a sexual manner.

After Wade reported Gross's behavior to Clark, Wade alleges that Gross gave her the silent treatment and that Gross would stare at her through the window in her office when Wade used the copy machine. Wade also claims that Gross would purposefully put her in danger by leaving the alarm off when she left, failing to lock the doors, and occasionally leaving the back

door open.  But this would only occur if Gross left the office after Wade and Akins, and it would be Akins, the first person to get into work, who would arrive to an unsecure office.

Gross discussed with Clark the possibility of firing Wade.  Akins found printed emails on top of the copy machine from Clark to Gross stating they should "hold off" until they could "say it's slow and let her go that way or something."  R. 28-7 at Page ID # 439.  Akins told Wade about these emails.   Clark insists that those discussions occurred because the office was legitimately not profitable, and that she told Gross to focus on increasing revenue, not decreasing staff.

*Religious Harassment.*  Wade claims that a shift change instituted by Automation constitutes religious harassment and retaliation.  Originally, both Wade and Akins worked 8:00 a.m. to 5:00 p.m.  But in an effort to conform to the hours of other offices, the office changed its hours to be open from 7:00 am to 6:00 p.m.  Gross split these hours into two shifts rather than one: one shift from 7:00 a.m. to 4:00 p.m. and another from 9:00 a.m. to 6:00 p.m.  Gross gave Akins, who had more seniority, the first pick between the two shifts.  Akins chose the earlier shift, and Wade was reassigned to work 9:00 a.m. to 6:00 p.m.  This change, Wade claims, interfered with her nightly family devotional, which occurred every evening and began around 6:00 p.m. or 6:30 p.m.  Wade was unhappy because, she alleges, when Akins hired her, Akins had promised Wade that her work schedule would not interfere with her nightly devotional. Wade acknowledges, however, that she never missed a devotional throughout her time at Automation.

Wade confronted Gross about the change and ultimately agreed to work the later shift. Akins left Automation because she was required to continue working with the racist client.

Wade followed suit and resigned. She later filed a charge of discrimination with the Equal Employment Opportunity Commission, leading to the underlying complaint.

## II.

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On review, we are to view all evidence and make all reasonable inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986). We review *de novo* a district court's grant of summary judgment. *Williams v. General Motors Corp.*, 187 F.3d 553, 560 (1999).

### 1. Title VII and THRA Claims

Wade alleges discrimination caused by a hostile work environment based on sexual harassment, racial harassment, religious harassment, and a cumulative theory. Under Title VII of the Civil Rights Act of 1964, an employer may not discriminate "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To establish a hostile-work-environment claim, a plaintiff must show that (1) she was a member of a protected class; (2) she was subject to unwelcomed harassment; (3) the harassment was based on her membership in that particular class; (4) the harassment created a hostile work environment; and (5) the employer failed to take reasonable care to prevent and correct any harassing behavior. *General Motors*, 187 F.3d at 560–61.

To be actionable, the workplace must be "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Syst.*, 510 U.S. 17,

21 (1993) (internal quotation marks and citations omitted). We consider the totality of the circumstances when deciding whether the allegedly discriminatory conduct reaches that level, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008) (internal quotation marks and citation omitted). The conduct must be objectively hostile or abusive, and the victim must also subjectively regard the environment as abusive. *Knox v. Neaton Auto Prods. Mfg.*, 375 F.3d 451, 459 (6th Cir. 2004); *Harris*, 510 U.S. at 21–22.

The Tennessee Supreme Court applies federal law in THRA cases. *See Day v. Krystal Co.*, 471 F. Supp. 2d 874, 882 (E.D. Tenn. 2007) (citing *Parker v. Warrren Cnty. Util. Dist.*, 2 S.W.3d 170, 172 (Tenn. 1999)). We accordingly analyze the THRA claim under federal law.

### a. Sexual Harassment

First, Wade alleges a hostile work environment created by same-sex sexual harassment. In same-sex sexual harassment cases, the Supreme Court has explained three ways to demonstrate that the harassment was "based on" sex: (1) where the harasser is acting out of sexual desire; (2) where the harasser is motivated by general hostility to the presence of women in the workplace; and (3) where the plaintiff offers "direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80–81 (1998); *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 765 (6th Cir. 2006). The plaintiff must also prove that "the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted '*discrimina[tion]* . . . because of . . . sex.'" *Oncale*, 523 U.S. at 81. Whether the plaintiff has met this burden depends

on an examination of the totality of the circumstances including "common sense" and an "appropriate sensitivity to social context." *Id.* at 82.

Wade argues that Gross's behavior constitutes actionable sexual harassment under the first two avenues. However, she has not shown that Gross was acting out of sexual desire or that Gross was motivated by a general hostility to the presence of women in the workplace. For the first avenue, Wade must present credible evidence that Gross's behavior towards Wade was motivated by sexual desire. *Id.* at 80; *EEOC v. Harbert-Yeargin, Inc.*, 266 F.3d 498, 522 (6th Cir. 2001).

Viewing Wade's allegations in the light most favorable to her, the conduct alleged constitutes socially unacceptable behavior, but falls short of demonstrating that Gross acted out of sexual desire. Wade may subjectively believe that Gross was attracted to her, but she has not presented objective proof of attraction to raise a genuine issue of material fact. She cites the bra incident, the undergarment comments, the "hoobie boobie" incident, and the "bitch in charge" comment. Occasional comments about Wade's breasts and her undergarments, standing alone, do not constitute sufficient credible evidence of sexual desire. *See Lavack v. Owen's World Wide Enter. Network, Inc.*, 409 F. Supp. 2d 848, 851, 855 (E.D. Mich. 2005) (concluding that a supervisor asking plaintiff if he was wearing boxers or briefs and asking on one occasion, "if you and I went camping in the woods, and I had anal sex with you, would you tell anyone?" constituted "crude male horseplay, not credible evidence of homosexuality"). The only evidence indicative of this theory is the conversation about Gross's lesbian friend, but Gross explicitly stated during that exchange that she was *not* a lesbian. On its face, Wade's allegations do not suggest that Gross acted out of sexual desire. And a jury could not reasonably make that inference from this evidence.

Wade argues that the district court erroneously relied on the fact that Gross had been married with two children as dispositive evidence that Gross was not attracted to Wade. But this fact was not dispositive; rather Wade's lack of evidence was and is dispositive. The district court relied on several other admissions by Wade, including the fact that Gross never propositioned her, never touched her or tried to touch her, never said that Gross was a lesbian or was attracted to Wade. Wade accordingly has not made out a same-sex sexual-harassment claim under the first avenue.

Wade has likewise not presented sufficient evidence regarding the second avenue for proving same-sex sexual harassment—conduct motivated by a general hostility towards women. Wade can prove this by showing that Gross used "sex-specific and derogatory terms" so "as to make clear that [she was] motivated by general hostility to the presence of women in the workplace." *Oncale*, 523 U.S. at 80; *see also General Motors*, 187 F.3d at 565.

Wade argues that Gross was hostile towards women when she called herself the "bitch in charge" and when she gave Wade the silent treatment after Wade reported Gross to Clark. But the Supreme Court has stated that "[w]e have never held that workplace harassment . . . is automatically discrimination because of sex merely because the words used have sexual content or connotations." *Oncale*, 523 U.S. at 80. We ask instead "'whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" *Id.* (quoting *Harris*, 510 U.S. at 25 (Ginsburg, J., concurring)). Wade's speculations about Gross's motivation do not meet this threshold. *See Baugham v. Battered Women, Inc.*, 211 F. App'x 432, 439 (6th Cir. 2006) ("[Plaintiffs] admitted [that defendants] did not direct any sexual comments or innuendos toward them . . . . [and plaintiffs'] conclusory

allegations and unsupported speculations [of] hostility toward females is insufficient to overcome summary judgment.").

Moreover, the conduct alleged to be sexual harassment, although unacceptable in a work environment, does not rise to the level of "severe or pervasive" in view of the factors outlined by the Supreme Court in *Harris*. The bra incident was the first time Gross had acted in a sexually inappropriate manner towards Wade. After that incident, Wade states that she "consistently" made inappropriate comments about bras, but it "happened so much off and on" that she could not provide an indication of frequency. R. 28-6, Wade Dep., Page ID # 292. Gross would walk through the office and jokingly ask Wade if she was wearing undergarments. And Gross "would laugh as if it was no big deal." *Id.* at Page ID # 293. These sporadic incidents constitute teasing rather than the "severe or pervasive" conduct required by Title VII. *See Baugham*, 211 F. App'x at 439–40 ("Most, if not all, of Plaintiffs' allegations consist of *one time occurrences that took place over a period of three years.* Even considering them in the totality, we can hardly say the environment was permeated with discriminatory intimidation, ridicule, and insult.").

### b. Racial Harassment

Next, Wade alleges a hostile work environment based on racial harassment, pointing to Gross's use of nicknames from *The Help* for Wade and Akins and Gross's comments about Mexicans. While this conduct might be socially repulsive, it is not actionable. Plaintiffs may show race-based harassment with either "(1) direct evidence of the use of race-specific and derogatory terms or (2) comparative evidence about how the alleged harasser treated members of both races in a mixed-race workplace." *Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 511 (6th Cir. 2011) (citing *Oncale*, 523 U.S. at 80–81). Again, the harassment must be "sufficiently

severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (internal quotation marks and citations omitted).

Although objectionable, Gross's use of nicknames for Wade and Akins was not severe or pervasive enough to create an "abusive working environment." In *CSX Transportation*, the plaintiff similarly alleged a racist confrontation in which the defendant stated that "this country should 'get rid of' Jesse Jackson and Al Sharpton because without those two 'monkeys' the country 'would be a whole lot better.'" 643 F.3d at 506. Much like that case, the comments here were deplorable yet too infrequently made to satisfy the pervasiveness requirement. Wade alleges just two racist encounters with Gross, and these conversations were neither physically threatening nor humiliating. There is no evidence that Gross's statement, "I'm the bitch in charge," was racially motivated in that it would not have occurred but for the fact that Wade was African-American. *Cf. Jackson v. Quanex Corp.*, 191 F.3d 647, 662 (6th Cir. 1999) (holding that evidence of express racial epithets being solely directed towards members of the protected class should have prompted the district court to consider as well "incidents that did not carry explicit racial overtones"). Finally, there is no evidence that the comments unreasonably interfered with Wade's work performance. We have repeatedly recognized that "occasional . . . 'offensive utterances'" do not rise to the level required to create a hostile work environment. *Grace v. USCAR*, 521 F.3d 655, 679 (6th Cir. 2008) (quoting *Harris*, 510 U.S. at 23). "To hold otherwise would risk changing Title VII into a code of workplace civility, a result we have previously rejected." *Id.* (internal quotation marks and citations omitted).

Wade also attempts to rely on the broader racial issues at Automation to support this theory, including the fact that Gross made disparaging comments about Mexicans and that she consistently considered race in employment placement. If conduct was not directed at the

plaintiff, however, "it weighs against a finding of an objectively hostile environment." *CSX Transp. Co., Inc.*, 533 F. App'x at 641 (citing *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997)). Not only were these comments not directed towards Wade or any other employee at Automation, they were isolated. In addition, Wade was a bystander to Gross's allegedly racist work practices. Gross's hiring practices did not objectively impact Wade's own work. Viewing the evidence in the light most favorable to Wade, she cannot show these comments amounted to an objectively hostile work environment. She accordingly cannot make out a claim of racial harassment.

### c. Religious Harassment

Wade also alleges religious harassment, arguing that Gross knew she was religious and targeted her by talking about drinking in front of her and by using sexual language. She also claims that Gross shifted Wade's schedule deliberately to interfere with her nightly devotional. But this evidence does not come close to being objectively hostile under our standard.

There is no evidence that the shift change was made to interfere with Wade's religious commitment. Gross and Clark stated that the shifts changed to conform to the office hours of other branches. Wade also acknowledged that her devotional start time was flexible and that she never missed a devotional throughout her time at Automation. And no one at Automation ever made any "disparaging comments" to Wade about her religious beliefs. R. 28-6 at Page ID # 289. Wade's claims of religious harassment accordingly fail.

### d. Cumulative Theory

Finally, Wade points to all of Gross's activity in the aggregate in an attempt to rely on a cumulative theory of harassment to prove a hostile work environment. *See Shazor v. Prof'l Transit Mgmt.*, 744 F.3d 948, 958 (6th Cir. 2014) ("Title VII does not permit plaintiffs to fall

between two stools when their claim rests on multiple protected grounds."). We have permitted plaintiffs to bring hostile-work-environment claims on this theory under certain special circumstances. For example, we have permitted the claim when a plaintiff alleges multiple hostile-work-environment claims based on different protected classifications (*e.g.*, race plus religious harassment) if one of the plaintiff's independent claims (racial harassment) is sufficient on its own. *See id.* at 598 (concluding that plaintiff presented enough evidence to state a racial-harassment claim, but also permitting plaintiff to proceed on a cumulative theory based on race and sex); *Hafford v. Seidner*, 183 F.3d 506, 514 (6th Cir. 1999) (holding that plaintiff presented enough evidence to state a racial-harassment claim, but also remanding for consideration of a cumulative theory based on race and religion). The claim must also meet the "severe or pervasive" threshold outlined in *Harris* and whether the conduct meets that standard is dependent on the totality of the circumstances. *General Motors*, 187 F.3d at 563–64.

This case is not one of those special cases. None of Wade's individual claims of hostile work environment rise to the level of "severe or pervasive" conduct and these allegations in the aggregate suffer from the same flaw. Wade alleges a few specific instances, such as the breast exposure and *The Help* nicknames, but these inappropriate comments were neither pervasive nor physically threatening, and therefore did not create an actionable hostile working environment. This case is unlike *General Motors* in which the court found that the pervasive, extremely offensive comments, physical contact, and threats towards the female plaintiff in a "male-dominated trade[]" constitutes conduct that was frequent, severe, threatening, and humiliating. *Id.* at 564. Moreover, these incidents do not demonstrate that Gross's behavior was directed towards Wade because she is a religious, African-American woman. Wade has not presented a claim of hostile work environment based on a cumulative theory.

## 2. Retaliation

Next, Wade alleges that Automation retaliated against her for complaining about Gross's harassment by changing her shift and constructively discharging her in violation of Title VII and the THRA. To show retaliation under Title VII, Wade must prove: (1) she engaged in protected activity; (2) her exercise of protected rights was known to the defendant; (3) the defendant thereafter took adverse employment action against the her, or she was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) a causal connection between the protected activity and the adverse employment action. *Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000) (citing *Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990)). Again, retaliation claims under the THRA follow federal law. *Gee-Thomas v. Cingular Wireless*, 324 F. Supp. 2d 875, 881 (M.D. Tenn. 2004). We will accordingly analyze them together.

An adverse employment action is a "'materially adverse change in the terms of . . . employment.'" *White v. Burlington N. & Santa Fe R. Co.*, 364 F.3d 789, 797 (6th Cir. 2004) (quoting *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996)). This requires a "significant change in employment status" rather than a "mere inconvenience." *Id.* at 797–98 (citations omitted). While we have recognized that a change in shift may constitute a significant change under certain circumstances, we have specifically held that a one-hour shift change is not an adverse employment action. *Regan v. Faurecia Auto. Seating, Inc.*, 679 F.3d 475, 481 (6th Cir. 2012). In view of our precedent, the one-hour-shift change in this case was a mere inconvenience. Moreover, Wade has admitted that even after the change, she never missed a family devotional. She has not presented sufficient evidence of retaliation under Title VII.

Wade has likewise not shown that she was constructively discharged. In some circumstances, a plaintiff may prove an adverse employment action by the fact that the harassment constituted constructive discharge. To demonstrate a claim for constructive discharge, Wade must show that "(1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, (2) the employer did so with the intention of forcing the employee to quit, and (3) the employee actually quit." *Id.* (citation omitted); *Pa. State Police v. Suders*, 542 U.S. 129, 146–47 (2004). We have laid out several factors relevant to considering whether the plaintiff has alleged objectively "intolerable working conditions," including harassment or humiliation, reassignment to menial work, or reduction in salary or job responsibilities. *Regan*, 679 F.3d at 482 (quoting *Saroli v. Automation & Modular Components, Inc.*, 405 F.3d 446, 451 (6th Cir. 2005)).

Wade alleges that Gross changed her shift to interfere with her devotional, that Gross stared at her through her window in her office while Wade was making copies, and that Gross purposely left the alarm off to scare her, and would fail to secure the back door of the building. She alleges that Gross did this because it was dangerous and that Gross wanted to scare her. As noted above, we do not recognize a one-hour shift change as "intolerable working conditions" under *Regan*. The rest of these allegations, including stares and silent treatment, fail to satisfy the burden.

### 3. State-Law Claims

Finally, Wade brings state-law claims for retaliatory discharge and for intentional infliction of emotional distress under Tennessee law. For retaliatory discharge, Tennessee law requires a plaintiff to show, among other things, that "the employer knowingly permitted conditions of discrimination in employment *so intolerable* that a reasonable person subject to

them would resign." *Campbell v. Fla. Steel Corp*, 919 S.W.2d 26, 34 (Tenn. 1996) (emphasis added). The standard is "greater than" the standard required to prove a hostile work environment. *See id.* As outlined above and as the district court recognized, Wade has not shown that her working conditions were objectively intolerable and her state-law claim for retaliatory discharge fails.

For intentional infliction of emotional distress, Wade must allege, among other things, conduct that is "so outrageous that it is not tolerated by civilized society." *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997) (quoting *Medlin v. Allied Inv. Co.*, 217 S.W.2d 270, 274 (Tenn. 1966)). We must distinguish between outrageous conduct and that conduct that consists of merely "insults, indignities, threats, annoyances, petty oppression, or other trivialities." *Swallows v. W. Elec. Co.*, 543 S.W.2d 581, 582–83 (Tenn. 1976) (citations omitted). Wade argues that Gross and Automation not only retaliated against her but tormented her, calling herself the "bitch in charge" and discussing drinking while knowing about her religious beliefs. These vague allegations and conclusory statements constitute teasing and do not rise to the level of "outrageous conduct" required to prove intentional infliction of emotional distress. Wade's state-law claim for intentional infliction of emotional distress fails.

### III.

For these reasons, we AFFIRM.