RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0033p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

JEFFRY L. SMITH,

                    *Plaintiff-Appellee,*

    *v.*

ROCK-TENN SERVICES, INC.,

                    *Defendant-Appellant.*

No. 15-5534

_____

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:12-cv-00616—John T. Nixon, District Judge.

Argued: January 15, 2016

Decided and Filed: February 10, 2016

Before: CLAY and ROGERS, Circuit Judges; THAPAR, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Randall S. Thompson, HUSCH BLACKWELL LLP, St. Louis, Missouri, for Appellant. Heather Moore Collins, COLLINS & HUNTER, PLLC, Brentwood, Tennessee, for Appellee. **ON BRIEF:** Randall S. Thompson, HUSCH BLACKWELL LLP, St. Louis, Missouri, Hillary L. Klein, HUSCH BLACKWELL LLP, Chattanooga, Tennessee, for Appellant. Heather Moore Collins, COLLINS & HUNTER, PLLC, Brentwood, Tennessee, for Appellee.

---

[*]The Honorable Amul R. Thapar, United States District Judge for the Eastern District of Kentucky, sitting by designation.

---

**OPINION**

---

CLAY, Circuit Judge.   Defendant Rock-Tenn Services, Inc., Plaintiff Jeffry L. Smith's former employer, appeals the judgment entered by the district court on the jury verdict in favor of Plaintiff on his sexual harassment claim alleging a hostile work environment brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, *et seq.*, as well as the district court's denial of its renewed motion for judgment as a matter of law and motion for a new trial. For the reasons that follow, we **AFFIRM**.

**BACKGROUND**

**Factual Background**

Plaintiff began working for Defendant, a corrugated box company, on August 2, 2010. Shortly after starting work at Defendant's plant in Murfreesboro, Tennessee, Plaintiff underwent orientation at which he learned about company safety policies, and received a company handbook and the company's sexual harassment policy.   Plaintiff worked as a support technician on a die cutter machine known as the "450" in the Converting Department, which his colleague Clinton Gill operated.   Plaintiff's duties included loading boxes, helping run the machine, and unjamming the machine when it got stuck.   When he was needed, Plaintiff also worked on another machine, known as the "303."   Each day began with a safety meeting, at which the team discussed safety and any injuries that had occurred.   Plaintiff testified that the Converting Department was approximately 70% men and 30% women.   The company's HR manager confirmed that women worked in the Converting Department.

In December 2010, Defendant's employee Jim Leonard returned from medical leave.   On the first evening that Leonard was in the plant, Plaintiff observed Leonard "come up behind" 450 operator Clinton Gill, "grab[] him in the butt," and then sniff his finger.   (Trial Tr., R. 106 at Page ID 875–76.)   Plaintiff continued to associate with Leonard in short conversations.   At some point, Leonard came by Plaintiff's workstation and "slapped [him] on the tail as he went by." (*Id.* at Page ID 877.)   Plaintiff responded by pointing at Leonard, as a warning to "keep [his]

hands off." (*Id.*) Although Plaintiff thought that "everything would be okay after that," approximately a week later, Leonard came up behind Plaintiff again while Plaintiff was working at the computer, and "grabbed [him] so hard on [the] butt that [his] tail was actually sore." (*Id.*) In response, Plaintiff grabbed Leonard by the arm, put his finger in Leonard's face, and demanded that Leonard never touch him again, stating, "[Y]ou're going to cause somebody to get hurt in here." (*Id.*) According to Defendant's sexual harassment policy, subjects of harassment are supposed to speak directly to their harassers to ask that the conduct be stopped before bringing their concerns to management. Plaintiff did not report either of these incidents both because of the policy and because he thought Leonard would stop after the warnings.

About a month later, on Saturday, June 4, 2011, Plaintiff was working at the 303 machine. While he was bent over to load boxes onto a pallet, Leonard came up behind him again, "grabbed [him] by [the] hips and started hunching on [him]" so that Leonard's "privates" were "up against [Plaintiff's] tail." (*Id.* at Page ID 879, 915.) Plaintiff turned around, grabbed Leonard by the throat for about thirty seconds, lifted him off the ground, and "was just blessing him out." (*Id.* at Page ID 879.) Plaintiff reported the incident to Gill, who told Plaintiff to go outside and calm down. When he returned, Leonard apologized to Plaintiff, saying, "I didn't know how far I could go with you." (*Id.* at Page ID 880.) Plaintiff responded that that should have been clear after the previous incident, and that if he touched Plaintiff again, someone was going to get hurt. Plaintiff was so upset that Gill set him home.

Over the weekend, Plaintiff spoke to a friend and colleague, James Sims, who told plant superintendent Scott Keck about the incident before Plaintiff arrived on the morning of Monday, June 6, 2011. At the daily safety meeting, Plaintiff brought the incident to the attention of his direct supervisor, Devonna Odum, who, according to Plaintiff's testimony, stated to Plaintiff that Leonard had "done . . . this again." (*Id.* at Page ID 881.) Soon thereafter, plant superintendent Keck called Plaintiff into his office, whereupon Plaintiff reported the incidents involving Leonard. Keck stated that nothing could be done until the following Friday because his supervisor, operations manager Bobby Hunter, was on vacation. At the conclusion of this meeting, Keck sent Plaintiff back out to work in the same area as Leonard.

While continuing to work in the same area as Leonard, Plaintiff was worried about whether Leonard would come up behind him again, found it difficult to concentrate, neglected to lock out a machine when cleaning it, got himself caught under a machine, and twice spent half an hour cleaning jam-ups that would normally have taken him a minute to resolve. During that week, Defendant sent Plaintiff and Leonard to get a hearing test together. Plaintiff testified that he was beside himself and wanted to kill Leonard.

He continued to work within 10–15 yards of Leonard the following week. On Wednesday, June 15, 2011, Plaintiff suffered an anxiety attack while at the hospital with his brother. The following day, Plaintiff prepared a letter to management documenting the incidents with Leonard. The letter alleged that Leonard had "done this to others after my 2nd Occurrence" and that Leonard "carries a Knife in his pocket [and] was said to have pulled it on one of the guys he's done this to." (Pl.'s App'x at 25.) The letter concluded:

> I Jeff Smith am requesting a sick leave from 6–16 through 21st of June at which time I have an appointment to seek counciling [sic] for the Sexual Harrasment [sic] I have recieved [sic] before returning to work. I don't feel I can do my job safely and could put myself and others around me at risk because this has consumed my thoughts. I like my job and most of the people and want to do my best but can't until I seek help.

(*Id.* at 26.) After a meeting with plant superintendent Scott Keck and operations manager Bobby Hunter, Plaintiff's request for leave was granted.

After receiving Plaintiff's letter, four senior managers called a meeting with Leonard to inquire about the incident. At that meeting, Leonard stated that Plaintiff had backed into him. Management then began interviewing other employees in the Converting Department, none of whom had witnessed the "hunching" incident. According to Hunter, Devonna Odum, Plaintiff's direct supervisor, had heard rumors about Leonard's behavior regarding another employee, Stephen Hackney. Hunter did not testify to the content of his conversation with Hackney. According to Hunter, Clinton Gill reported a pinch in the side. When Hunter spoke to Nick Clark, Hunter testified that Clark stated, "I already told Wade [Phillips, Defendant's HR manager] about it and it's been handled." (R. 107, Trial Tr. at Page ID 1033.) Phillips later testified that the company handbook, which set forth policies for investigating complaints,

including for sexual harassment, was "a guideline that could be followed" but was not always; in Plaintiff's case, Defendant did not procure written statements from any of the employees interviewed or prepare an investigation report. (*Id.* at Page ID 960–61.) The only record of this investigation was a page of handwritten notes. Although Hunter, Keck, and HR manager Wade Phillips recommended that Leonard be terminated, general manager David McIntosh suspended Leonard for a day and a half to two days on Thursday, June 16 and on Friday, June 17, 2011. McIntosh testified that he "based [his] decision on the investigation of the Saturday night occurrence" and "didn't go back and investigate instances that had happened in the past." (*Id.* at Page ID 1058.) Although Phillips testified that Leonard's pay was suspended while he was not working, Leonard testified that it was not. He returned to the plant the following Monday.

When McIntosh imposed the suspension, his colleagues had not made him aware that Leonard had been disciplined on March 22, 2011 for touching another worker, Kendrick Roper, on his clothed backside when Roper was standing at the urinal. Roper, who later testified to having heard of numerous incidents between Leonard and other men, reported the incident to his supervisor, Devonna Odum. He was then called in to a meeting with Scott Keck and Bobby Hunter, who did not ask for a written statement from him. Keck wrote up the incident on a form and brought it to Leonard on the factory floor for his signature. The write-up was placed in Leonard's personnel file, which described the issue as "Horseplay – sexual harassment," and stated that Keck and Hunter had "met with Jim to address a complaint from a coworker about unwanted contact which Jim deemed . . . horseplay. We reviewed the companys [sic] sexual harrasment [sic] policy and Jim understood it." (Tr. Ex. 12; Pl.'s App'x at 21.) The "Action to Improve" was "No contact with any employees that would be interpreted as sexual harrasment [sic]." (*Id.*) Above the signature boxes, a handwritten note stated, "Any future complaints would be subject to termination of employment." (*Id.*) However, Keck and Hunter did not inform McIntosh, who was actually in charge of discipline, that the incident involving Roper had occurred.

Plaintiff did not return to Rock-Tenn. He stated that he mostly sat at home for approximately a year and half, went on Paxil, had difficulty sleeping, and experienced an anxiety attack when someone came up behind him in the checkout aisle of the supermarket. Eventually,

his short-term disability insurance ran out. Plaintiff's licensed clinical social worker, who saw him on thirteen occasions beginning on June 22, 2011, diagnosed him with post-traumatic stress disorder. The social worker noted "sleep disturbances, uncontrollable thoughts about his attacker, irritability and rage, panic attacks when . . . the obtrusive thoughts occur . . . hypervigilance, loss of ability to concentrate, feelings of hopelessness and guilt and feeling humiliated before his peers at work." (R. 107, Trial Tr., at Page ID 1142.) Leonard was fired in July 2013 after he admitted in a deposition in this litigation that he had "mooned" or touched other men in the workplace. He testified that all of this conduct was directed towards men.

## Procedural History

Plaintiff filed suit in the United States District Court for the Middle District of Tennessee on June 15, 2012, alleging sexual harassment, wrongful termination, and retaliation under the Tennessee Human Rights Act, T.C.A. § 4-21-101, *et seq.* After receiving a right-to-sue letter from the EEOC, Plaintiff amended his complaint to add claims for hostile work environment and constructive discharge under Title VII. On January 17, 2014, the district court granted partial summary judgment to Defendant on the retaliation and constructive discharge claims under Tennessee law and Title VII but denied summary judgment on the Title VII and Tennessee Human Rights Act hostile work environment claims.

Prior to trial, Defendant moved *in limine* to exclude evidence of Leonard's alleged bad acts toward other employees and the circumstances of Plaintiff's departure from Defendant and other issues regarding Plaintiff's post-employment circumstances, such as his mental health. The district court denied Defendant's motion as to Leonard's prior misconduct but deferred ruling on the admissibility of evidence regarding Plaintiff's post-employment circumstances until trial, instead instructing counsel to inform the court prior to introducing such evidence. A trial was held from February 4–6, 2014. Plaintiff's counsel did not inform the district court prior to introducing evidence of Plaintiff's post-employment circumstances, including his loss of insurance. When Defendant objected, the district court typically told Plaintiff's counsel to "move on."

At the close of Plaintiff's case, Defendant moved for judgment as a matter of law, which the district court denied. On February 7, 2014, the jury returned a verdict in favor of Plaintiff on his hostile work environment claim, with compensatory damages of $307,000. The jury instructions describing the components of a hostile work environment claim are not in the record. Judgment was entered on February 12, 2014. On March 12, 2014, Defendant renewed its motion for judgment as matter of law pursuant to Rule 50(b) and moved for a new trial pursuant to Rule 59(a). On April 16, 2015, the district court denied the renewed motion for judgment as a matter of law and motion for a new trial as to the Title VII claim, but granted judgment as a matter of law on the Tennessee Human Rights Act claim because the statute of limitations had run. The district court also reduced the amount of compensatory damages from $307,000 to $300,000 in order to comply with the Title VII cap on statutory damages. Defendant now appeals.

## DISCUSSION

### I. Renewed motion for judgment as a matter of law

#### Standard of Review

We review *de novo* a district court's denial of a renewed motion for judgment as a matter of law made pursuant to Rule 50(b). *Rhinehimer v. U.S. Bancorp Investments, Inc.*, 787 F.3d 797, 804 (6th Cir. 2015) (citing *Barnes v. City of Cincinnati*, 401 F.3d 729, 736 (6th Cir. 2005)). In so doing, we may not weigh the evidence, question the credibility of witnesses, or substitute our own judgment for that of the jury. *Rhinehimer*, 787 F.3d at 804. Rather, we may grant such a motion only "when viewing the evidence in a light most favorable to the non-moving party, giving that party the benefit of all reasonable inferences, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party." *Balsley v. LFP, Inc.*, 691 F.3d 747, 757 (6th Cir. 2012).

#### Analysis

Title VII of the Civil Rights Act of 1964 prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

42 U.S.C. § 2000e-2(a)(1). Plaintiffs alleging sex discrimination, including for sexual harassment, may recover on a theory of a hostile work environment. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 73 (1986). The Supreme Court has construed Title VII to allow hostile work environment claims where the harasser and the victim are of the same sex. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998).

In general, to prevail on a hostile work environment claim, a plaintiff must show that (1) he or she was a member of a protected class; (2) he or she was subjected to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the charged sexual harassment created a hostile work environment; and (5) the employer is liable. *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006). To establish employer liability where the harasser is a co-worker, a plaintiff must show that the employer knew or should have known of the conduct and failed to take prompt and appropriate corrective action. *E.E.O.C. v. Harbert-Yeargin, Inc.*, 266 F.3d 498, 518 (6th Cir. 2001).

Defendant does not allege that the district court misstated the law or issued erroneous jury instructions. Rather, Defendant assails the jury verdict in Plaintiff's favor, arguing that he failed to establish practically all of the elements necessary to prevail on a Title VII hostile work environment claim, particularly where the alleged harasser and victim are of the same sex. It argues that Plaintiff failed to show that Leonard's harassment was based on sex, created an objectively hostile work environment, or that Defendant failed to take immediate and appropriate corrective action, and that Defendant is therefore entitled to judgment as a matter of law.

## A. Harassment Based on Sex

As the Supreme Court has recognized, "[c]ourts and juries have found the inference of discrimination easy to draw in most male-female sexual harassment situations," but the inference of discrimination based on sex may become more complicated when the alleged harasser and victim are of the same sex. *Oncale*, 523 U.S. at 80. Cautioning courts and juries not to mistake "ordinary socializing in the workplace[,] such as male-on-male horseplay" for "discriminatory conditions of employment," *Oncale* held:

> The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

*Id.* at 81–82.

Following *Oncale*, this Circuit allows a plaintiff alleging same-sex harassment in hostile work environment cases to establish the inference of discrimination based on sex in three ways: "(1) where the harasser making sexual advances is acting out of sexual desire; (2) where the harasser is motivated by general hostility to the presence of men in the workplace; and (3) where the plaintiff offers 'direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace.'" *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 765 (6th Cir. 2006) (quoting *Oncale*, 523 U.S. at 80–81).

Plaintiff took the third of these evidentiary routes at trial by attempting to persuade the jury that Defendant operated a mixed-sex workplace in which Leonard exposed men and only men to unwelcome touching. On appeal, Defendant argues that no reasonable jury could find discrimination based on sex because Leonard's behavior was mere "horseplay" beyond the reach of Title VII. Viewing the evidence in the light most favorable to Plaintiff and giving him the benefit of all reasonable inferences, as we must, we cannot accept this self-serving characterization of Leonard's behavior. "Horseplay" was much discussed at trial, and the jury apparently found that pinching and slapping someone on the buttocks or grinding one's pelvis into another's behind goes far beyond horseplay. This conclusion is not so unreasonable as to entitle Defendant to judgment as a matter of law.

Defendant also argues that Plaintiff and Leonard worked in what could not have been found to be a mixed-sex workplace. Plaintiff testified that he worked in the Converting Department, whose workforce consisted of 70% men and 30% women. Plaintiff's direct supervisor was female and he also mentioned a "couple" of women "in tow motors" as well as a woman who "ran the strapper." (R. 106, Trial Tr. at Page ID 875.) Tow motor drivers would

"com[e] back and forth at times" and the supervisor "mov[ed] around, checking things." (*Id.* at Page ID 874.) He described the strapper as "down here in the corner" in a drawing he made of the Converting Department, which he showed to the district court and the jury but which is not in the record; it is unclear on the record to this Court where the strapper was located relative to Plaintiff's machine. (*Id.* at Page ID 873–74.) Plaintiff referred to speaking with his female supervisor at the daily safety meeting on at least one occasion, and Defendant's HR manager confirmed that women worked in the Converting Department.

Defendant did not dispute any of this testimony, but instead relies on *EEOC v. Harbert-Yeargin, Inc.*, 266 F.3d 498 (6th Cir. 2001), and *Johnson v. Hondo, Inc.*, 125 F.3d 408, 413 n.6 (7th Cir. 1997), to argue that the Converting Department was a gender-segregated workplace, precluding a jury verdict in Plaintiff's favor. *Harbert-Yeargin* is distinguishable: we held in that case that judgment as a matter of law was warranted when only three of the defendant's 292 employees at a construction site—some 1% of the defendant corporation's workforce—were women and all of them worked in the on-site office, rather than out in the field where the alleged harassment was taking place. *Johnson* likewise concerned an area of the defendant's workplace in which no women worked and through which women passed only occasionally. *See* 125 F.3d at 413 n.6. In light of Plaintiff's uncontroverted testimony that some 30% of employees in the Converting Department were women and that men and women encountered one another regularly—and especially in the absence of Plaintiff's diagram—we cannot adopt Defendant's characterization of its plant as a gender-segregated workplace.

Plaintiff also presented evidence to the jury that the harasser treated men and women differently: Leonard testified at trial to mooning other men at work, and to having touched at least seven colleagues, all of them male. Thus, Plaintiff has done exactly what the Supreme Court asked of him in *Oncale*: he has "offer[ed] direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace." 523 U.S. at 80–81. By arguing that Plaintiff "must do more than show [Leonard's] lack of misconduct toward women," Defendant essentially asks us to impose additional, unspecified requirements for making out a case beyond what *Oncale* and the case law of our Circuit require. (Def.'s Br. at 22.) Not only are we bound by the dictates of the Supreme Court, but presenting evidence of

misconduct against only one sex, and a lack of misconduct against the other, may be a perfectly acceptable trial strategy in cases such as this one: such evidence may make differential treatment the obvious inference to draw. We remain mindful that the "critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale*, 523 U.S. at 80 (citation omitted). Construing the evidence in Plaintiff's favor, we believe that that was the case at Defendant's plant.

### B. Whether the Harassment Created a Hostile Work Environment

A plaintiff seeking to proceed on a hostile work environment theory must next prove that the environment at the workplace was hostile. This is so when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (internal citations omitted). To succeed, a plaintiff must show that the work environment was both subjectively and objectively hostile; in other words, that the plaintiff not only perceived the work environment as hostile, but that a reasonable person would have found it hostile or abusive as well. *Id.* at 21–22. When assessing the hostility of a work environment, courts and juries consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's performance." *Randolph*, 453 F.3d at 733 (quoting *Harris*, 510 U.S. at 23). It is undisputed that Plaintiff subjectively found the work environment severely hostile, and that it interfered with his performance.

Consistent with *Harris*' conceptual distinction between physically threatening or humiliating behavior and "mere offensive utterance[s]," 510 U.S. at 23, we have long held that "harassment involving an element of physical invasion is more severe than harassing comments alone." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 334 (6th Cir. 2008) (citation omitted) (reversing summary judgment to defendant in a hostile work environment claim brought under Ohio law where a harasser made frequent lewd comments and "on one occasion" rubbed against one of the plaintiffs "with 'his private area'"). *See also Williams v. Gen. Motors Corp.*, 187 F.3d

553, 559 (6th Cir. 1999) (reversing a grant of summary judgment to the defendant where harassers had made repeated sexual comments, asked the plaintiff to walk backwards into him, and once touched her neck).

In conducting our inquiry, we may also "consider evidence of other acts of harassment of which a plaintiff becomes aware during the period [of] his or her employment, even if the other acts were directed at others and occurred outside of the plaintiff's presence." *Hawkins*, 517 F.3d at 335 (summarizing this Court's Title VII jurisprudence in a hostile work environment sexual harassment case brought under Ohio anti-discrimination statute). *See also Jackson v. Quanex Corp.*, 191 F.3d 647, 660–62 (6th Cir. 1999); *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1077 (6th Cir. 1999); *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 249 n.4 (6th Cir. 1998). In hostile work environment cases, we consider the "work environment as a whole" rather than individual instances of harassment. *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000) (citing *Williams*, 187 F.3d at 562–63). Thus, we may consider both the incidents in which Leonard touched Plaintiff and the incident Plaintiff observed in which Leonard pinched Gill's rear. Defendant focuses only on the incidents directly involving Plaintiff, which it describes as "sporadic, isolated male-on-male horseplay" that cannot constitute an objectively hostile work environment. (Def.'s Br. at 26.) Plaintiff stresses that the jury heard evidence from which it could conclude the work environment was objectively hostile or abusive.

Like several of our fellow circuits, we consider whether harassment was so severe and pervasive as to constitute a hostile work environment to be "quintessentially a question of fact." *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006); *see also Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 335 (4th Cir. 2010); *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 798 (10th Cir. 2007). Defendant appears to be dissatisfied with the jury's resolution of that question, and asks us to reverse it as unreasonable. Yet none of the many cases on which Defendant relies involved the same severity of physical contact as occurred here, and many involved incidents spread out over a much longer period of time; moreover, Defendant identifies no case law in which we overturned a jury verdict on comparable facts. *See, e.g., Wade v. Automation Pers. Servs., Inc.*, 612 F. App'x 291, 298 (6th Cir. 2015) (affirming summary judgment for inappropriate comments, one gesture, and one incident of harasser exposing her breasts); *Clark v.*

*United Parcel Serv., Inc.*, 400 F.3d 341, 344 (6th Cir. 2005) (affirming summary judgment where harassment consisted of sexual jokes, two instances of placing a vibrating pager on the plaintiff's thigh, and one incident in which harasser tried to look down the plaintiff's overalls occurring over two and half years); *Morris v. Oldham Cty. Fiscal Court*, 201 F.3d 784, 790 (6th Cir. 2000) (affirming summary judgment where harassment consisted of several dirty jokes in the plaintiff's presence; one verbal sexual advance related to the plaintiff's evaluation; a single reference to the plaintiff as "Hot Lips" and isolated comments about the plaintiff's clothing took place over approximately sixteen months).

By contrast, all of the incidents Plaintiff experienced or of which he was aware that took place over the roughly six months that he and Leonard both worked in the plant involved the element of physical invasion we have found so crucial in cases like *Williams*. According to Plaintiff, the three incidents between him and Leonard took place over the course of a few months: about a week separated the first and second incidents, and the third incident occurred a month or more after that. Plaintiff described these incidents as escalating from a slap on the rear, to a painful grab on the rear, to grab by the hips and "hunching," i.e., briefly simulating sex. A threatening gesture after the first incident and a verbal threat after the second apparently did nothing to prevent subsequent incidents. The incident Plaintiff observed with Gill similarly involved inappropriate touching. Taking into account all the circumstances and viewing the facts in the light most favorable to the Plaintiff, we cannot say that the jury's determination that a hostile or abusive work environment existed was unreasonable.

**C. Defendant's Response**

The last requirement for a Title VII hostile work environment claim is employer liability. To impose liability on an employer for the harassing conduct of a plaintiff's co-worker, a "plaintiff must show that the employer's response to the plaintiff's complaints 'manifest[ed] indifference or unreasonableness in light of the facts the employer knew or should have known.'" *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 814 (6th Cir. 2013) (quoting *Hawkins*, 517 F.3d at 338). A plaintiff must therefore show that the employer "knew or should have known of the harassment" and "failed to take prompt and appropriate corrective action." *McCombs v. Meijer, Inc.*, 395 F.3d 346, 353 (6th Cir. 2005) (quoting *Harbert-Yeargin*, 266 F.3d

at 518). "Generally, a response is adequate if it is reasonably calculated to end the harassment." *Waldo*, 726 F.3d at 814. Appropriate steps "may include promptly initiating an investigation." *Id.* Even separating the harasser and victim immediately may not be enough without further action on the employer's part. *West v. Tyson Foods, Inc.*, 374 F. App'x 624, 633 (6th Cir. 2010).

Following company policy, Plaintiff initially tried to address the incidents with Leonard directly, and brought the unwanted touching to Defendant's attention only after the June 4, 2011 "hunching" incident, whereupon Plaintiff's operator, Clinton Gill, sent him home for the day. Plaintiff brought the incident to the attention of his supervisor and to plant superintendent Scott Keck on June 6, 2011 but Keck, who had given Leonard the disciplinary warning some two and a half months prior, informed him that nothing could be done until operations manager Bobby Hunter returned from vacation at the end of the following week. After that meeting, Plaintiff returned to work in the Converting Department and worked for a week and a half some 10–15 yards from Leonard; at some point during that time, Plaintiff and Leonard were sent out for a hearing test together. Only after Plaintiff wrote to management to document the incidents and request leave on June 16, 2011 did Defendant initiate an investigation.

When the investigation was finally initiated, management called Leonard in to speak with them, and apparently took him at his word that he had put his arm around Plaintiff and that Plaintiff backed into him. HR manager Wade Phillips testified that Defendant did not follow its own policies; the outcome of the investigation was not the required written report but a page of barely legible notes. That write-up, such as it was, contained red flags on which Defendant appears to have followed up only minimally, as indicated by a note regarding Nick Clark's complaint about Leonard to Phillips, which Clark later said had been handled, and Devonna Odum's mention of rumors about Jim touching an employee named Stephen Hackney. Although Hunter claimed to have spoken to Hackney, no notes appear under his name. At the conclusion of the investigation, Keck and Hunter never communicated to David McIntosh, who was in charge of discipline, that the bathroom incident between Leonard and Roper had occurred and that Leonard had been told that future complaints of sexual harassment would result in discharge. Thus, despite the prior warning, Defendant only suspended Leonard for a day and a half to two days. According to Leonard, he was never even deprived of pay.

Defendant argues that the steps it took were so clearly prompt and appropriate as to entitle it to judgment as a matter of law.  Yet Defendant fails to grasp that what it failed to do is just as important.  In *West*, 374 F. App'x 624, in which we affirmed the denial of a defendant's renewed motion for judgment as a matter of law, we identified a number of steps that a reasonable jury might have thought the defendant should have taken, but did not.  In this case, a reasonable jury could have concluded that Defendant's total inaction for ten days, where Defendant knew that Leonard had touched Plaintiff, and had told Leonard that further complaints would result in termination, was unreasonable.  Defendant did not separate the two men, suspend Leonard pending an investigation, or initiate its investigation in a timely manner; a reasonable jury could find that the failure to take any of these steps or others rendered its response neither prompt nor appropriate in light of what it knew or should have known regarding Leonard's prior misconduct.

## II.     Motion for a new trial

### Standard of review

We review the denial of a motion for a new trial for abuse of discretion.  *Tompkins v. Crown Corr, Inc.*, 726 F.3d 830, 835 (6th Cir. 2013).  We consider a district court to have abused its discretion when we have "'a definite and firm conviction that the trial court committed a clear error of judgment.'"  *Id.* (quoting *Mike's Train House, Inc. v. Lionel, LLC*, 472 F.3d 398, 405 (6th Cir. 2006)).  "[A] new trial is warranted when a jury has reached a seriously erroneous result as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, *i.e.,* the proceedings being influenced by prejudice or bias."  *Balsley v. LFP, Inc.*, 691 F.3d 747, 761 (6th Cir. 2012) (citation omitted).  This Court allows district courts "'[b]road discretion . . . in determinations of admissibility based on considerations of relevance and prejudice,' and we do not 'lightly overrule' those decisions."  *West v. Tyson Foods, Inc.*, 374 F. App'x 624, 636 (6th Cir. 2010) (quoting *United States v. Penney*, 576 F.3d 297, 315 (6th Cir.2009)).

Where the motion is based on alleged attorney misconduct, as here, the movant must make a "concrete showing" that the conduct "consistently permeated" the trial such that the

moving party was unfairly prejudiced by the misconduct. *Tompkins*, 726 F.3d at 835 (6th Cir. 2013). This Court then considers "the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case . . . and the verdict itself." *Balsley*, 691 F.3d at 761.

**Analysis**

As a threshold matter, we must determine whether Defendant has preserved its evidentiary challenges for appeal. Prior to trial, Defendant moved *in limine* to exclude evidence of Leonard's harassment of other men of which Defendant was unaware and Plaintiff did not witness, and Plaintiff's post-employment circumstances, such as his medical bills and unemployment. The district court denied Defendant's request to exclude evidence of Leonard's inappropriate behavior toward other employees, but deferred ruling on the admissibility of evidence of Plaintiff's post-employment circumstances, and requested that Plaintiff's counsel inform the court before introducing such evidence. "If the trial court has made an explicit and definitive ruling on the record of the evidentiary issues to be decided, and has not indicated that the ruling is conditioned upon any other circumstances or evidence, then counsel need not renew the objection at the time the evidence is offered." *United States v. Brawner*, 173 F.3d 966, 970 (6th Cir. 1999). Thus, Defendant has properly preserved its challenge to the admissibility of Leonard's prior harassment. However, when a motion *in limine* is not ruled upon, counsel must object at trial to preserve error. *United States v. Finnell*, 276 F. App'x 450, 453 (6th Cir. 2008) (citing *United States v. Kelly*, 204 F.3d 652, 654 (6th Cir. 2000)). With respect to post-employment circumstances, the record shows that Defendant objected to all but one of the comments made by Plaintiff that it considered inadmissible, objected to Wade Phillips' testimony regarding Plaintiff's departure, but appears not to have timely objected to the testimony of Gene Doyle Kermicle, Plaintiff's therapist. Defendant has therefore preserved its objections only to the first two witnesses. Finally, failure to object to an opening or closing argument, as was the case here, "raise[s] the degree of prejudice which must be demonstrated in order to get a new trial on appeal." *Strickland v. Owens Corning*, 142 F.3d 353, 358 (6th Cir. 1998).

### A. Leonard's prior acts

In its ruling on the motion *in limine*, the district court cited *Hawkins* for the proposition that "the factfinder may consider similar acts of harassment of which a plaintiff becomes aware during the course of his or her employment, even if the harassing acts were directed at others or occurred outside of the plaintiff's presence." 517 F.3d at 336. Defendant takes this statement out of context to mean that acts of harassment that Plaintiff did not witness and of which Defendant was unaware are inadmissible for any purpose. In *Hawkins*, two of the plaintiffs knew of instances of harassment directed against a co-worker who had not joined the lawsuit; the court simply held that a factfinder could consider those acts of harassment when deciding whether the work environment was objectively hostile, and was subjectively perceived by the plaintiffs to be so. *Hawkins* in no way limited any other purpose for which the evidence might be offered, including for the purpose of establishing whether harassment is based on sex. By introducing this evidence, Plaintiff merely followed the directive of *Oncale* that a plaintiff may offer "direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace." 523 U.S. 75, 80–81. Because this evidence was admissible, its introduction does not entitle Defendant to a new trial.

### B. Plaintiff's post-employment circumstances

Federal law allows prevailing plaintiffs in Title VII actions to recover compensatory damages for "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." 42 U.S.C. § 1981a(b)(3). This Circuit allows plaintiffs to recover for ongoing mental distress where that distress stems from the alleged discriminatory conduct. *See, e.g.*, *West*, 374 F. App'x at 642; *Turic v. Holland Hosp., Inc.*, 85 F.3d 1211, 1215 (6th Cir. 1996). Steadfast in its theory that all of Plaintiff's post-employment woes were due to his voluntary separation from employment, Defendant argues that this evidence was irrelevant and inadmissible. Defendant relies heavily on *Betts v. Costco Wholesale Corp.*, 558 F.3d 461, 472 (6th Cir. 2009), in which this Court, construing a Michigan anti-discrimination statute, reversed an award of emotional distress damages where there was "no material evidence in the record regarding any emotional distress that [a particular plaintiff] suffered as a result of Costco's hostile work environment" and her "distress flowed instead from the financial

difficulties she faced after her nondiscriminatory discharge." However, the record is not so devoid of evidence as in *Betts* that Plaintiff's prolonged psychological difficulties, including depression, stemmed directly from the harassment he faced. For example, Plaintiff experienced a panic attack when someone came up close behind him in a supermarket aisle after he had left his job. Where Plaintiff's testimony regarding his post-employment mental state concerned the lasting effects of the harassment, the evidence was admissible, and Plaintiff's counsel did not act improperly in questioning him about it.

### 1. Questioning of Wade Phillips

Defendant misconstrues the questioning of Phillips by Plaintiff's counsel to suggest that counsel was out of line in eliciting testimony about Plaintiff "quitting his job"—a term used by Phillips, not by counsel. Plaintiff's counsel was attempting unsuccessfully to lay a foundation for Defendant's letter to the EEOC by asking, among other things, about Defendant's failure to mention the first two incidents between Leonard and Plaintiff in the letter and Defendant's claim to the EEOC that Plaintiff had not submitted anything regarding fear of future incidents. The district court then declined to admit the EEOC letter into evidence. Plaintiff's counsel asked when Defendant was "made aware of any sort of change in [Plaintiff]'s employment status," a question that Plaintiff's counsel argued went to the statute of limitations, an issue Defendant had raised at the summary judgment stage. (R. 107, Trial Tr. at Page ID 1004.) Soon thereafter, the parties stipulated that Plaintiff had left employment in September 2011. This questioning was not improper, and does not entitle Defendant to a new trial.

### 2. Questioning of Plaintiff

The direct examination of Plaintiff by Plaintiff's counsel was hardly as outrageous as Defendant suggests. In its brief, Defendant objects to five instances of Plaintiff's testimony that it claims were improperly elicited. One of these was not objected to, and the district court intervened before Plaintiff answered counsel's question in another instance. The remaining three instances of testimony about the allegedly inadmissible issues, including the fact that Plaintiff's short-term disability insurance ran out, were part of Plaintiff's roundabout narrative answers to questions that concerned the ongoing psychological effects of the incidents with Leonard. After

each instance, Defendant objected to the substance of the testimony but not to the lengthy narrative answers given by Plaintiff. When ruling on the objection, the district court would simply say, "Let's move on." The conduct of Plaintiff's counsel was not improper, especially in light of the ambiguous signals sent by the district court.

### 3. Questioning of Doyle Gene Kermicle

Even if Plaintiff had properly objected to the testimony of Doyle Gene Kermicle, Plaintiff's therapist, the admission of his testimony would not necessitate a new trial. Kermicle's questioning proceeded much as Plaintiff's had: Plaintiff's counsel would ask an open-ended question, typically about how Plaintiff was doing when Kermicle saw him at a particular appointment, and Kermicle would provide a lengthy narrative answer. In response to questions about Plaintiff's condition on particular dates, Kermicle testified that Smith had claimed he was unable to return to work, and "had apparently decided at that point to quit work, just give up and not go back," and that "he couldn't afford to continue the therapy because he was going to be losing his insurance." (R.107, Trial Tr. at PageID 1138.) While the jury should not have heard these comments, it does not appear that they prejudiced or biased its decision. Furthermore, the district court clarified in a jury instruction that Plaintiff did not have a claim related to his separation from employment. Generally, a motion for a new trial should be denied when any prejudice that might have resulted from the error was cured by instructions from the court. *Holmes v. City of Massillon, Ohio*, 78 F.3d 1041, 1047 (6th Cir. 1996). A few improper stray comments are not sufficient to warrant a new trial, especially when the district court issued a curative instruction.

### 4. Opening and closing statement

Finally, in Plaintiff's opening and closing statement, counsel stated that Plaintiff was unable to come back to work, lost his short-term disability insurance, "lost his job," and "ultimately had to leave work" due to the harassment. (R. 108, Trial Tr. at Page ID 1191–92.) To merit a new trial, Defendant must show "a reasonable probability that the verdict of the jury has been influenced" by the improper conduct of Plaintiff's counsel. *Innovation Ventures, LLC v. N2G Distrib., Inc.*, 763 F.3d 524, 542 (6th Cir. 2014). We require a heightened showing of

prejudice when, as here, a party fails to object. *Balsley*, 691 F.3d at 761. With only the hostile work environment claim proceeding to trial, counsel should not have made these comments. However, the district court cured this error by instructing the jury prior to opening and closing statements that the arguments of counsel are not evidence. *See id.* at 765 (heightened showing of prejudice unmet where improper comments were short relative to lengthy closing statement and district court issued an instruction that counsel's arguments were not evidence). Viewing the totality of the circumstances, we believe that the district court did not abuse its discretion in denying Defendant's motion for a new trial.

## CONCLUSION

For the reasons stated above, we **AFFIRM** the judgment of the district court.