[Cite as *Montgomery v. St. John's United Church of Christ*, 2023-Ohio-1168.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| JEAN MONTGOMERY, et al. | JUDGES:<br>Hon. John W. Wise, P.J. |
|     Plaintiffs-Appellants | Hon. Craig R. Baldwin, J.<br>Hon. Andrew J. King, J. |
| -vs- | |
| | Case No. 2022 CA 00025 |
| ST. JOHN'S UNITED CHURCH OF<br>CHRIST, et al. | |
|     Defendants-Appellees | O P I N I O N |

CHARACTER OF PROCEEDING:       Civil Appeal from the Court of Common
Pleas, Case No.  2020 CV 00916

JUDGMENT:                    Affirmed

DATE OF JUDGMENT ENTRY:      April 6, 2023

APPEARANCES:

For Plaintiffs-Appellants

ALAN I. GOODMAN
3401 Enterprise Parkway
Suite 340
Beachwood, Ohio  44122

DAVID W. NEEL
DAVID W. NEEL, LLC
13800 Shaker Boulevard
Suite 102
Cleveland, Ohio  44120

For Defendant-Appellee St. Johns

CHRISTOPHER A. TIPPING
STARK & KNOLL CO., LPA
3475 Ridgewood Road
Akron, Ohio  44333

For Defendant-Appellee Martin

THOMAS A. SKIDMORE
THOMAS A. SKIDMORE CO., LPA
655 West Market Street
Akron, Ohio  44303

*Wise, P. J.*

**{¶1}** Appellants Jean Montgomery, David Montgomery and Shelley Peebles appeal the January 3, 2022, decision of the Stark County Court of Common Pleas granting summary judgment in favor of Appellees St. John's United Church of Christ and Jerry Martin.

<u>STATEMENT OF THE FACTS</u>

**{¶2}** This action arises from allegations of employment-related sexual discrimination made by Appellants Jean Montgomery and Shelley Peebles against Appellees St. John's United Church of Christ and congregation member Jerry Martin.

**{¶3}** The facts and procedural history relevant to this appeal are as follows:

**{¶4}** Appellant Jean Montgomery was employed as a minister at St. John's from November, 2014, until July 9, 2019. Appellant Shelley Peebles was employed as a pastoral assistant from September, 2017, until April 16, 2019. In their Complaint, Appellants allege, *inter alia*, that they were subjected to sexual harassment by Appellee Jerry Martin individually and in his church leadership capacity and that, as a result of the acts of harassment, a hostile work environment was created. Appellants further allege that as a result of their objecting to and resisting these acts of sexual harassment, their employment was terminated.

**{¶5}** Appellant David Montgomery has also asserted a loss of consortium claim in connection with the tort injury claims of his wife Jean Montgomery.

<u>*Jean Montgomery*</u>

**{¶6}** The evidence establishes that Appellant Montgomery worked at St. John's UCC from November 29, 2014, until July 9, 2019. During that nearly five-year period of

employment, the acts of "harassment" identified by Montgomery consist of one church conference in Columbus in September, 2018, some meetings at Summa Akron City Hospital (where Montgomery had another job as chaplain), three telephone calls, and a few conversations in the church parking lot.

{¶7} With regard to the 2018 church conference in Columbus, Montgomery complains that Martin was drinking alcohol at the restaurant where they were having dinner. She asked him why he was drinking so much, and she found his drinking "disturbing". When their waiter left them a card for another restaurant where he worked, Martin in jest wrote "for a good time call" above the waiter's name. Montgomery found this "disturbing" as well. Martin was, according to Montgomery, intoxicated and was making "off-color comments" and clearly wanted to keep drinking into the evening. He asked Montgomery if she wanted to have a drink with him after dinner and she declined. Nothing else happened between Montgomery and Martin at this conference.

{¶8} During the lunchtime meetings at Summa, the general purpose of which was for Martin and Montgomery to discuss church issues, the offending conduct by Martin consisted of him occasionally talking to Montgomery about his personal life, his marriage, and an extra-marital affair he was having. Montgomery has identified the specific dates of February 20, 2018, February 4, 2019, March 7, 2019, April 3, 2019, and April 8, 2019.

{¶9} According to Montgomery, she was "not comfortable" with the personal nature of some of Martin's disclosures. Martin allegedly told her "[she] was his minister and that is what [she] was supposed to be there for." Montgomery said, "No you need a professional, that's not what I do." Martin allegedly "talked about having sex with his wife … and how he did not enjoy it, and she did not fulfill him ... and that clothes would remain

on." Martin was "frightened that his wife would find out" about the affair he was having ... and "wanted to make sure [Montgomery] didn't say anything." Martin also on occasion referred to himself as a lowlife and said he was afraid he was going to get fired at his job and expressed concerns about his own drinking. He expressed that he was "miserable with his life, miserable with his marriage." The specific statements that "bugged" Montgomery were Martin's descriptions of the deficiencies in the sexual aspect of his marriage, specifically, that sex with his wife was not good but the woman he was having an affair with liked sex and was willing to engage in oral sex. At times he used the "F" word.

{¶10} Montgomery alleges that such comments made her "uncomfortable" and she found them "alarming and well beyond anything [she] had ever been told by a parishioner."

{¶11} However, Montgomery admits Martin never spoke to her in a sexual way about having sex with her, never sexually propositioned her or asked her to have a sexual relationship with him, never indicated that any kind of sexual activity was required in order to keep her job, never touched her in any unwanted manner, never asked her about her own sex life, and never threatened her in any way.

{¶12} With respect to the three telephone calls, Montgomery claims that Martin was intoxicated and on one occasion asked her to come down to the church so they could "have some fun", which Montgomery took as a sexual proposition. During the second phone call, Martin allegedly asked Montgomery if she found him "sexy" or "appealing", to which she replied "no". According to Montgomery, Martin "was drunk, hated his life, and his meds weren't working." The third phone call was the next morning, when Martin called

to explain the previous evening's call and told Montgomery he was having panic attacks and was going to the hospital. She allegedly told him he "needed to get help."

**{¶13}** In a four-page email she sent to the Consistory following these incidents, Montgomery detailed her complaints about Martin, including his drinking problem, his controlling nature, his lack of vision as Consistory president, his unwarranted control over church spending, his erratic decision-making, his "my way or the highway" attitude, his delays and mistakes in processing paychecks, his moodiness, his abrasive manner in supervising other employees, his priorities and decisions regarding building repairs and upgrades, and his dictatorial personality.

**{¶14}** She also mentioned the meetings at Summa and complained that she refused to be his counselor and he needed to get a professional counselor, because "most of the time" she was "doing pastoral care with him as he deals with the messes going on in his life." She said this was "not working" and that he "doesn't listen."

**{¶15}** The email also mentions the two "inebriated" phone calls when Martin was "very difficult to deal with".

**{¶16}** With regard to Montgomery's employment, she was terminated on July 9, 2019, by a written agreement entitled "Agreement for Dissolution and Termination of a Pastoral Relationship". The agreement provided for two months of severance pay plus benefits, until September 7, 2019, along with a release of claims by Montgomery. That release language reads as follows:

> The minister, acknowledging receipt of financial payments under this agreement, covenants and agrees that he/she waives all rights to demand and/or secure a civil court and/or a jury trial with respect to adjudication of

the matters contained in this Dissolution and Termination Agreement, in matters that pertain to her ministry in the church and/or the negotiations that have led up to this agreement.

*** 

It is understood that this Dissolution and Termination Agreement is a final disposition of all matters between the pastor and the congregation. This Dissolution and Termination Agreement contains the entire agreement between the parties hereto and any representations made before or during negotiation are hereby merged in their entirety and this Agreement may not be modified.

The undersigned parties have negotiated this Agreement in good faith and have every intention of being in [sic] fulfilling it and further agree to the releases contained herein, representing that they understand its contents and sign it as their own free act after a full review of the contents.

**{¶17}** The Agreement was approved by the Church Consistory on July 8, 2019. It was signed on July 9, 2019, by the church Consistory President and Vice President, by church executive committee members, by the church Treasurer, and by Montgomery herself.

### *Shelley Peebles*

**{¶18}** Appellant Peebles also received late-night phone calls from Appellee Martin after he had been drinking, confiding in her about his affair and the state of his marriage and complaining that his wife did not like to have sex with him. Martin allegedly asked Peebles if she found him sexually attractive or "fuckable", to which she replied that she

did not. Peebles would sometimes stay on the phone with Martin into the late hours, because Martin was obviously inebriated and in a troubled emotional state and Montgomery, her supervisor, wanted Peebles to stay in contact to make sure he was okay.

**{¶19}** Martin never sexually propositioned Peebles or asked her to have a sexual relationship with him, never indicated that any kind of sexual activity was required in order to keep her job, never touched her in any unwanted manner, never asked her about her own sex life, and never threatened her in any way.

**{¶20}** While at the conference in Columbus, Martin showed up at Peebles' hotel room later in the evening and asked her for a massage, stating his back was hurting from the drive. Peebles is a licensed massage therapist, which Martin knew, and she had given massages to other people in private homes and in commercial settings "countless times". Martin asked if he should remove his clothes, and she told him "no", so he remained clothed and she gave him a 20-minute massage, during which time he fell asleep. He was on the spare bed and when he awoke a short time later he "appeared startled" and immediately left the room.

**{¶21}** The circumstances of Peebles' alleged employment termination are unclear. Peebles herself has no first-hand knowledge of how her termination came about, as she was only told about it second-hand by Montgomery. According to Montgomery, Appellee Martin personally terminated Peebles on April 16, 2019, after Montgomery unilaterally gave Peebles a leave of absence to deal with some "personal problems".

**{¶22}** The church's by-laws do not provide for terminations by individual members of the consistory. There is no evidence in the record of any termination action taken by the Consistory or any other governing board with respect to Peebles.

**{¶23}** On June 19, 2020, Appellants Jean Montgomery and Shelley Peebles, Michael Horner and David Montgomery filed a Complaint against Appellees St. John's United Church of Christ and Jerry Martin.

**{¶24}** Montgomery and Peebles asserted various sexual harassment/hostile work environment claims and set forth the following causes of action: Count I, alleging that Appellees Jean Montgomery and Shelley Peebles were terminated from employment based on sex (Montgomery and Peebles) and age (Montgomery) in violation of R.C. §4122; Count II alleged claims of assault and battery against Appellee Martin; Count III alleged defamation (libel and slander) against both Appellees. Count IV alleged loss of consortium claims brought by David Montgomery and Michael Horner in connection with the tort injury claims brought by Jean Montgomery and Shelley Peebles.

**{¶25}** On August 19, 2020, and September 28, 2020, respectively, Appellees St. John's UCC and Jerry Martin filed Motions to Dismiss.

**{¶26}** On September 28, 2020, Appellants filed a Brief in Opposition.

**{¶27}** On November 9, 2020, Appellees filed Reply Briefs.

**{¶28}** On February 10, 2021, the trial court filed a Judgment Entry denying Appellees' Motions to Dismiss in part and granting in part. The trial court found that Montgomery's claim of employment discrimination/wrongful termination on the basis of sex and age were barred and therefore dismissed said claims. In addition, the trial court

dismissed the loss of consortium claim of Michael Horner because he and Shelley Peebles were not married.

{¶29} On August 27, 2021, St. John's UCC and Jerry Martin filed separate Motions for Summary Judgment.

{¶30} On October 5, 2021, Jean Montgomery, Shelley Peebles and David Montgomery filed a Joint Response to the Motions for Summary Judgment.

{¶31} On October 12, 2021, Appellees filed reply briefs.

{¶32} By Judgment Entry filed January 3, 2022, the trial court granted Appellees' Motions for Summary Judgment as to the following:

(a) all claims of employment discrimination asserted by Plaintiff Montgomery and Plaintiff Peebles in Count I of the Complaint (including termination and sexual harassment/hostile work environment claims);

(b) all claims of Assault and Battery asserted by Plaintiff Montgomery and Plaintiff Peebles in Count II of the Complaint;

(c) all claims of Libel and Slander (Defamation) asserted by Plaintiff Montgomery in Count II of the Complaint;

(d) All claims of Loss of Consortium asserted by Plaintiff David Montgomery in Count IV of the Complaint.

{¶33} The only claim left remaining was Appellant Peebles' defamation claim which she dismissed without prejudice on January 28, 2022.

{¶34} It is from the trial court's January 3, 2022, decision Appellants now appeal, raising the following errors for review:

### ASSIGNMENTS OF ERROR

**{¶35}** "I. THE TRIAL COURT ERRED WHEN IT GRANTED SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS-APPELLEES ON PLAINTIFFS-APPELLANTS JEAN MONTGOMERY'S AND SHELLEY PEEBLES' CLAIMS OF SEXUAL HARASSMENT/HOSTILE WORK ENVIRONMENT BASED ON THE "MINISTERIAL EXCEPTION."

**{¶36}** "II. THE TRIAL COURT ERRED WHEN IT GRANTED SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS-APPELLEES ON PLAINTIFF-APPELLANT JEAN MONTGOMERY'S CLAIM OF SEXUAL HARASSMENT/HOSTILE WORK ENVIRONMENT BASED ON AN AFFIRMATIVE DEFENSE OF RELEASE OF CLAIMS

**{¶37}** "III. THE TRIAL COURT ERRED WHEN IT GRANTED SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS-APPELLEES ON PLAINTIFF-APPELLANT DAVID MONTGOMERY'S LOSS OF CONSORTIUM CLAIM."

*Summary Judgment Standard of Review*

**{¶38}** Civil Rule 56 states, in pertinent part:

Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule. A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds

can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

{¶39} A trial court should not enter summary judgment if it appears a material fact is genuinely disputed, nor if, construing the allegations most favorably towards the non-moving party, reasonable minds could draw different conclusions from the undisputed facts. *Hounshell v. Am. States Ins. Co.*, 67 Ohio St.2d 427, 424 N.E.2d 311 (1981). The court may not resolve any ambiguities in the evidence presented. *Inland Refuse Transfer Co. v. Browning-Ferris Inds. of Ohio, Inc.*, 15 Ohio St.3d 321, 474 N.E.2d 271 (1984). A fact is material if it affects the outcome of the case under the applicable substantive law. *Russell v. Interim Personnel, Inc.*, 135 Ohio App.3d 301, 733 N.E.2d 1186 (6th Dist. 1999).

{¶40} When reviewing a trial court's decision to grant summary judgment, an appellate court applies the same standard used by the trial court. *Smiddy v. The Wedding Party, Inc.*, 30 Ohio St.3d 35, 506 N.E.2d 212 (1987). This means we review the matter de novo. *Doe v. Shaffer*, 90 Ohio St.3d 388, 2000-Ohio-186, 738 N.E.2d 1243.

**I.**

{¶41} In their first assignment of error, Appellants argue the trial court erred in granting summary judgment in favor of Appellees based on Appellants' claims of sexual harassment/hostile work environment based on the "ministerial exception." We disagree.

*Sexual Harassment - Hostile Work Environment Claims*

**{¶42}** A plaintiff may establish a violation of R.C. §4112.02(A)'s prohibition of discrimination "because of * * * sex" by proving either of two types of sexual harassment: (1) "*quid pro quo*" harassment, *i.e.,* harassment that is directly linked to the grant or denial of a tangible economic benefit, or (2) "hostile environment" harassment, *i.e.,* harassment that, while not affecting economic benefits, has the purpose or effect of creating a hostile or abusive working environment.

**{¶43}** Appellants herein allege a hostile work environment claim, not a "quid pro quo" claim.

**{¶44}** In order to establish a claim of hostile-environment sexual harassment, the plaintiff must show (1) that the harassment was unwelcome, (2) that the harassment was based on sex, (3) that the harassing conduct was sufficiently severe or pervasive to affect the "terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment," and (4) that either (a) the harassment was committed by a supervisor, or (b) the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action. *Hampel v. Food Ingredients Specialties, Inc.*, 89 Ohio St.3d 169, 176-77, 729 N.E.2d 726, 732–33 (2000)

**{¶45}** "Harassing conduct that is simply abusive, with no sexual element, can support a claim for hostile-environment sexual harassment if it is directed at the plaintiff because of his or her sex." *Id.* at paragraph four of the syllabus. On the other hand, "harassment is not automatically discrimination because of sex merely because the words used have sexual content or connotations." *Id.*

**{¶46}**  A hostile work environment exists when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 309 (6th Cir. 2016) (quoting *Harris*, 510 U.S. at 21).

*Ministerial Exception*

**{¶47}**  Appellees argue that the ministerial exception applies in this case.

**{¶48}**  The Free Exercise and Establishment Clauses provide that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." The First Amendment to the U.S. Constitution. Lower federal courts interpreting these clauses have long recognized a ministerial exception that is grounded in the First Amendment and "bar[s] the government from interfering with the decision of a religious group to fire one of its ministers." 1259 *Hosanna–Tabor,* —— U.S. ——, 132 S.Ct. at 702, 705, 181 L.Ed.2d 650.

**{¶49}**  In *Hosanna–Tabor,* the United States Supreme Court affirmed the exception and clarified "that the [ministerial] exception operates as an affirmative defense to an otherwise cognizable claim, [instead of] a jurisdictional bar." *Id.* at 706, 709 at fn. 4.

**{¶50}**  "The constitutional ministerial exception is rooted in the First Amendment's guarantee of religious freedom and generally bars civil courts from reviewing decisions of religious organizations relating to the employment of their ministers." *Hollins v. Methodist Healthcare, Inc.* (W.D.Tenn.2005), 379 F.Supp.2d 907, 911, citing *Lewis v. Seventh Day Adventists Lake Region Conference* (C.A.6, 1992), 978 F.2d 940, 942–943. "The exception precludes any inquiry whatsoever into the reasons behind a church's ministerial

employment decision." *EEOC v. Roman Catholic Diocese of Raleigh, N.C.* (C.A.4, 2000), 213 F.3d 795, 801.

**{¶51}** The Supreme Court in *Hosanna–Tabor,* "expresse[d] no view on whether the exception bar[red] other types of suits, including actions by employees alleging breach of contract or tortious conduct by their religious employers." ––– U.S. –––––, 132 S.Ct. at 710, 181 L.Ed.2d 650. Several state courts, however, have applied the ministerial exception to common-law claims, when they stem directly from the individual's employment and are inextricably entangled with the employee's discrimination claim. *See Kant,* No. 2011–CA–000004–MR; *Givens v. St. Adalbert Church,* No. HHDCV126032459S, 2013 WL 4420776 (Conn Super. Ct. July 25, 2013); *DeBruin v. St. Patrick Congregation,* 2012 WI 94, 343 Wis.2d 83, 816 N.W.2d 878.

**{¶52}** "While we agree that matters regarding 'who should preach from the pulpit' are fundamentally and unquestionably beyond the jurisdiction of secular courts [citations omitted], the cases demonstrate that *all* matters of the propriety of internal church discipline * * * whether taken against a clergyman or a church member, are beyond the jurisdiction of secular courts." *Howard v. Covenant Apostolic Church, Inc.* (1997), 124 Ohio App.3d 24, 705 N.E.2d 385 (citations omitted).

**{¶53}** The trial court herein determined that Montgomery and Peebles were ministerial employees. Appellants herein do not challenge their status as ministerial employees, but argue instead that the Ministerial exception should not bar their claims of sexual harassment and/or hostile work environment.

**{¶54}** Upon review, we find that the consensus among circuit courts that have addressed this issue is that the ministerial exception bars any judicial consideration of a

church's tangible employment actions taken against a minister in a discrimination claim, regardless of its underlying basis. *See, e.g.*, *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 969 (9th Cir. 2004) (stressing that "in both the sexual harassment and retaliation contexts, *Elvig* may not rely on protected ministerial decisions—the removal of certain duties, her suspension, her termination and the refusal to permit the circulation of her personal information form—as bases for the Defendants' liability under Title VII"); *Skrzypczak v. Roman Catholic Diocese of Tulsa*, 611 F.3d 1238, 1246 (10th Cir. 2010); *Middleton v. United Church of Christ Bd.*, 6th Cir. No. 20-4141, 2021 WL 5447040.

{¶55} The circuits are split on whether the ministerial exception categorically bars courts from considering a minister's hostile-work-environment claims. *See, e.g.*, *Demkovich v. St. Andrew the Apostle Par., Calumet City*, 3 F.4th 968, 973 (7th Cir. 2021) (*en banc*) (categorical bar); *Skrzypczak*, 611 F.3d at 1246 (categorical bar); *Elvig*, 375 F.3d at 965 (no categorical bar).

{¶56} The trial court below, after a thorough and well-reasoned analysis, found that the "ministerial exception" to state employment laws prevented it from reviewing the church's internal disciplinary matters because it could not "evaluate or adjudicate the hostile work environment claims without excessively entangling itself in the religious workings of the church and the 'ecclesiastical domain'". (1/3/2022 Judgment Entry at 19). The court found that due to the nature of relationships of the parties involved and the subject matter of the conversations and communications between them, it could not "adjudicate the sexual harassment claims of Appellants without distinguishing between Appellee Martin as a parishioner in the congregation seeking counsel, guidance, and comfort from his pastor and pastoral assistant, and Martin as a church officer engaging

in harassing or hostile behavior." (Judgment Entry at 22). The court found that it could not make this distinction or determination without "delving deeply into the relationships and expectations of the parties and their church and their faith." *Id.*

**{¶57}** We agree that this is precisely the kind of state inquiry into church employment decisions that the First Amendment forbids. *Elvig*, 375 F.3d at 961–62 (citing *Bollard v. Cal. Province of the Soc'y of Jesus*, 196 F.3d 940, 946 (9th Cir. 1999)); *cf. Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1169 (4th Cir. 1985).

**{¶58}** Our review of the record and case law convinces us that the trial court's determination that the ministerial exception prevents application of a secular review and analysis of such claims in this case without engaging in "excessive entanglement" with the ecclesiastical inner workings of the church was supported by competent, credible evidence, and the trial court properly determined that the ministerial exception stripped it of jurisdiction to consider their claims that the church had violated state employment laws

**{¶59}** Appellants' first assignment of error is overruled.

**II.**

**{¶60}** In their second assignment of error, Appellants argue the trial court erred in granting summary judgment in favor of Appellees on Appellants' claims of sexual harassment/hostile work environment based on an affirmative defense of release of claims. We disagree.

**{¶61}** Because the trial court found an alternate, independent ground for granting Appellees' motions for summary judgment, which this Court found to be supported by the record, we find any analysis as to whether the trial court erred in finding that Appellant Jean Montgomery's claims were barred by virtue of the executed release in this matter to

be unnecessary under the two-issue rule. "By virtue of the two-issue rule, a decision which is supported by one or more alternate grounds properly submitted is invulnerable to attack on one issue only." *Freeport Lodge # 415 Free & Accepted Masons of Ohio v. MC Mineral Company,* 5th Dist. Guernsey No. 18 CA 2, 2018-Ohio-3783, ¶ 12, citing *Suermondt v. Lowe*, 5th Dist. Morgan No. 10-CA-2, 2011-Ohio-5752, ¶ 22, citing *Hampel v. Food Ingredients Specialties, Inc.*, 89 Ohio St.3d 169, 185, 729 N.E.2d 726 (2000).

**{¶62}** Based on this Court's disposition as set forth in Assignment of Error I, we find Appellants' second assignment of error to be moot.

III.

**{¶63}** In their third assignment of error, Appellants argue the trial court erred in granting summary judgment in favor of Appellees on David Montgomery's loss of consortium claim. We disagree.

**{¶64}** The trial court granted Appellees' motion for summary judgment on Mr. Montgomery's claim for loss of consortium because the loss of consortium claim is derivative of Jean Montgomery's tort claim. "[A] claim for loss of consortium is derivative in that the claim is dependent upon the defendants having committed a legally cognizable tort upon the spouse who suffers bodily injury." *Bowen v. Kil-Kare, Inc.*, 63 Ohio St.3d 84, 585 N.E.2d 384 (1992). Having found that the trial court properly granted summary judgment as to all of Jean Montgomery's claims, we find the trial court did not commit error in granting summary judgment on Mr. Montgomery's claim for loss of consortium.

**{¶65}**  Appellants' third assignment of error is overruled.

**{¶66}**  For the reasons stated in the foregoing opinion, the judgment of the Stark County Court of Common Pleas is affirmed.


By: Wise, P. J.

Baldwin, J., and

King, J., concur.


JWW/kw